# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| GEOFFREY PESCE, | ) | |
| | ) | Civil Action No. 18-cv-11972 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| KEVIN F. COPPINGER, in his official | ) | |
| capacity as Essex County Sheriff, | ) | |
| AARON EASTMAN, in his official | ) | |
| capacity as Superintendent of the Essex | ) | |
| County House of Corrections - Middleton, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page**

**TABLE OF CONTENTS** ...................................................................................................... i

**TABLE OF AUTHORITIES** ............................................................................................ iii

**TABLE OF ABBREVIATIONS** ......................................................................................... v

**INTRODUCTION** ............................................................................................................... 1

**FACTS** ................................................................................................................................ 2

    A. Opioid Use Disorder Is A Serious Medical Need And Public Health Crisis In The
    Commonwealth Of Massachusetts ......................................................................... 2

    B. Medication Assisted Treatment (MAT) Is The Standard Of Care For Treating Opioid Use
    Disorder ................................................................................................................. 3

    C. Methadone Is Medically Necessary To Treat Mr. Pesce's Opioid Use Disorder ............... 4

    D. Mr. Pesce Is Expected To Report To Middleton HOC On Or About September 24, 2018,
    For A Period Of At Least 60 Days Of Incarceration. ........................................................ 6

    E. Absent Judicial Intervention, Middleton HOC Will Terminate Mr. Pesce's Methadone
    Treatment Contrary To The Standard Of Care. ................................................................ 7

**ARGUMENT** ................................................................................................................... 10

**I.**   **MR. PESCE IS LIKELY TO SUCCEED ON THE MERITS** ....................................... 10

    A. Mr. Pesce Is Likely To Succeed In Showing That, In His Circumstances, The Denial Of
    Continued MAT Is Deliberate Indifference To Serious Medical Need That Violates The
    Eighth Amendment. ............................................................................................... 10

        *1. Opioid Use Disorder Is An Objectively Serious Illness.* .............................................. 11

        *2. Refusing To Treat Mr. Pesce's Opioid Use Disorder, And Arbitrarily And Abruptly
        Discontinuing His Physician-Prescribed Medication, Will Constitute Deliberate
        Indifference.* ....................................................................................................... 14

    B. Mr. Pesce Is Likely To Succeed On The Merits Of His ADA Claim .............................. 15

        *1. Mr. Pesce Is A Qualified Individual With A Disability.* .............................................. 15

        *2. Mr. Pesce Will Be Denied The Benefit Of Health Care Programs And Discriminated
        Against Because Of His Disability.* ......................................................................... 16

**II.  MR. PESCE WILL SUFFER IMMEDIATE IRREPARABLE INJURY IF HE IS DENIED ACCESS TO MAT WHILE INCARCERATED.** ................................................ 19

**III. THE BALANCE OF HARMS AND PUBLIC INTEREST STRONGLY FAVOR THE GRANT OF EMERGENCY INJUNCTIVE RELIEF.** ...................................................... 20

**CONCLUSION** ........................................................................................................ 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A Helping Hand, LLC v. Baltimore Cnty., Md.*,
  515 F.3d 356 (4th Cir. 2008) ...................................................15

*Ancata v. Prison Health Svcs., Inc.*,
  769 F.2d 700 (11th Cir. 1985) ..................................................20

*Boswell v. Sherburne County*,
  849 F.2d 1117 (8th Cir. 1988) ..................................................20

*Bragdon v. Abbott*,
  524 U.S. 624 (1998)...........................................................15

*Brown v. Plata*,
  563 U.S. 493 (2011)...........................................................10

*Buchanan v. Maine*,
  469 F.3d 158 (1st Cir. 2006)...............................................15, 16

*Chambers v. NH Prison*,
  562 F. Supp. 2d 197 (D.N.H. 2007).............................................19

*CRC Health Grp., Inc. v. Town of Warren*,
  No. 2:11-CV-196-DBH, 2014 WL 2444435 (D. Me. Apr. 1, 2014) ....................16

*Davis v. Carter*,
  452 F.3d 686 (7th Cir. 2006) .................................................11

*Estelle v. Gamble*,
  429 U.S. 97 (1976)............................................................10

*Farmer v. Brennan*,
  511 U.S. 825 (1994)........................................................10, 11

*Farnam v. Walker*,
  593 F. Supp. 2d 1000 (C.D. Ill. 2009) ........................................19

*Foelker v. Outagamie County*,
  394 F.3d 510 (7th Cir. 2005) .................................................11

*Helling v. McKinney*,
  509 U.S. 25 (1993).........................................................10, 11

*Henrietta D. v. Bloomberg*,
    331 F.3d 261 (2d Cir. 2003)..................................................................18

*Iwata v. Intel Corp.*,
    349 F. Supp. 2d 1359 (D. Mass. 2004) ...............................................17

*Jones v. City of Boston*,
    752 F.3d 38 (1st Cir. 2014)...................................................................15

*Kosilek v. Spencer*,
    774 F.3d 63 (1st Cir. 2014) (en banc) ...............................11, 12, 13, 14

*Largess v. Supreme Judicial Court for State of Massachusetts*,
    317 F. Supp. 2d 77 (D. Mass. 2004), *aff'd*, 373 F.3d 219 (1st Cir. 2004)..............................10

*Miranda-Rivera v. Toledo-Davila*,
    813 F.3d 64 (1st Cir. 2016)...................................................................11

*Pennsylvania Dep't of Corrections v. Yeskey*,
    524 U.S. 206 (1998)........................................................................15, 16

*Rio Grande Cmty. Health Ctr., Inc. v. Rullan*,
    397 F.3d 56 (1st Cir. 2005)...................................................................19

*United States v. Charwell Operating, LLC*,
    https://www.ada.gov/charlwell_sa.html (last viewed Sept. 19, 2018)....................................18

*Winter v. Natural Resources Defense Council, Inc.*,
    555 U.S. 7 (2008)..................................................................................10

## Statutes

42 U.S.C. § 12102.......................................................................................15

42 U.S.C. § 12131(2)..................................................................................15

42 U.S.C. § 12112(b)(5)(A).........................................................................18

42 U.S.C. § 12132.................................................................................15, 16

42 U.S.C. § 12210.......................................................................................15

Americans with Disabilities Act ........................................................ *passim*

Mass. Gen. Laws Ch. 90 § 23 .......................................................................6

## Other Authorities

28 C.F.R. § 35.108(b)(2)..............................................................................15

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| Ex. __ | Exhibit to the Declaration of Robert Frederickson III |
| FDA | U.S. Food and Drug Administration |
| Pesce Decl. ¶ __ | Declaration of Geoffrey Pesce |
| MAT | Medication-assisted treatment |
| Potee Decl. ¶ __ or Potee Ex. __ | Declaration of Ruth A. Potee, M.D., or exhibits thereto |
| Richard Pesce Decl. ¶ __ | Declaration of Richard Pesce |
| Rosenthal Decl. ¶ __ or Rosenthal Ex. __ | Declaration of Richard N. Rosenthal, M.D. or exhibits thereto |
| Middleton HOC | Essex County House of Correction – Middleton |
| SAMHSA | Substance Abuse and Mental Health Service Administration |
| Yuasa Decl. ¶ __ | Declaration of Shorta Yuasa, M.D. |

## INTRODUCTION

Plaintiff Geoffrey Pesce has been diagnosed with and currently suffers from opioid use disorder, a chronic brain disease developed after years of active opioid addiction. From the late 2000s to 2016, despite his repeated attempts to cease opioid use, his once productive life was gradually displaced by unemployment, homelessness, and estrangement from his family and son. That all began to change in December 2016, when Mr. Pesce's physician prescribed medication-assisted treatment (MAT) that included the prescription drug methadone. Mr. Pesce has since made a dramatic recovery:  he does not use illegal drugs, he is employed as a machinist, he contributes financially to support his family, and he is a responsible and caring parent to his son. Mr. Pesce represents one of the few success stories to arise from the opioid-driven public health crisis in Massachusetts.

Unfortunately, on July 19, 2018, Mr. Pesce's mother was unexpectedly unavailable to drive him to the methadone treatment facility due to the death of a neighbor. Mr. Pesce—feeling as though he had no other option—made the mistake of driving himself, even though his license had been revoked due to an operating-under-the-influence charge that arose before his recovery. Mr. Pesce was pulled over on July 19th for driving six miles over the speed limit and charged with operating on a revoked or suspended license. The charge carries a mandatory minimum sentence of 60 days, which he will likely serve in the Essex County House of Correction – Middleton (the "Middleton HOC"). Mr. Pesce expects to be sentenced at his next court appearance in five days, on September 24, 2018.

It is Middleton HOC's policy and practice to categorically refuse to provide MAT to inmates with opioid use disorder, even those (like Mr. Pesce) who arrive with a prescription for such medication and are already in sustained recovery as a result of access to the medication. If Mr. Pesce does not receive this medication, he will suffer from painful withdrawal and be placed

at a high risk of relapse, overdose, and death. Accordingly, as applied to Mr. Pesce, this policy and practice violates the Eighth Amendment's guarantee against cruel and unusual punishment, which prohibits deliberate indifference to an inmate's serious medical need. The policy and practice also violates the Americans with Disabilities Act, which prohibits the disparate treatment of people suffering from substance use disorders.

Pursuant to Rule 65, this motion seeks emergency injunctive relief to require the correctional authorities at Middleton HOC to provide Mr. Pesce with continued access to his medically necessary, physician-prescribed medication to treat his opioid use disorder when he is jailed on or about September 24, 2018, and throughout his incarceration. To the extent that Middleton HOC does not wish to administer the medication (which is taken orally) in its own infirmary, it could drive Mr. Pesce to his current treatment facility—which is only five minutes away—to receive his daily dosage or contract with a provider at that facility to visit the HOC.

## FACTS

### A. Opioid Use Disorder Is A Serious Medical Need And Public Health Crisis In The Commonwealth Of Massachusetts.

Opioid use disorder is a chronic brain disease. Rosenthal Decl. ¶ 11; Potee Decl. ¶ 6. Its symptoms include craving, increasing tolerance to opioids, withdrawal symptoms, and a loss of control. *Id.* Without treatment or other recovery, people with opioid use disorder are often unable to control their use of opioids. Rosenthal Decl. ¶ 12; Potee Decl. ¶¶ 8-10. Like many other chronic diseases, genetic factors account for much of a person's vulnerability to addiction. Potee Decl. ¶ 7; Rosenthal Decl. ¶ 16. Additional risk factors include early exposure while the brain is developing and childhood trauma. Potee Decl. ¶ 7; Rosenthal Decl. ¶ 17.

The country is in the midst of a public health crisis driven by opioid use. More than half a million people have died from opioid overdose in the last twenty years and that death toll has

risen exponentially in just the last five years.  *See* Rosenthal Decl. ¶¶ 18-21.  Opioid dependence

is also causing a broader public health crisis, including through the increasing spread of

infectious diseases like HIV.  *Id*. ¶ 23.

The situation in Massachusetts is particularly dire.  There were 2,069 confirmed and

estimated opioid-related overdose deaths in Massachusetts in 2017, *i.e.*, an average of almost six

opioid-related overdose deaths *per day*.  *Id*. ¶ 22.  Massachusetts has long struggled to solve this

problem; in 2014 the fatal overdose rate in Massachusetts was more than double the national

average.  Rosenthal Ex. 24 at 2.  And in Essex County, where Mr. Pesce resides, the problem is

especially severe.  Among the 14 counties in the Commonwealth, Essex County had the second

highest number of opioid-related deaths in 2017, as well as for the period from 2000-2017.  Ex.

1.

Opioid use disorder is especially dangerous for people who are or have been incarcerated.

*See* Potee Decl. ¶¶ 18-22.  In 2015, nearly 50 percent of all deaths among those released from

incarceration were opioid-related.  *Id.* ¶ 22.  A recent study by the Massachusetts Department of

Public Health found that "[t]he opioid overdose death rate is 120 times higher for those recently

released from incarceration compared to the rest of the adult population."  *Id*., Ex. H at 50.

**B.    Medication Assisted Treatment (MAT) Is The Standard Of Care For Treating Opioid Use Disorder.**

The standard of care for opioid use disorder is MAT (medication-assisted treatment),

which refers to a treatment regimen that combines medication and counseling.  Potee Decl.

¶¶ 11-13; Rosenthal Decl. ¶¶ 26-27; *see also* Yuasa Decl. ¶¶ 6-8.  The medications used in MAT

are methadone, buprenorphine (commonly referred to by the brand name Suboxone), and

naltrexone (commonly referred to by the brand name Vivitrol), which are the only three

medications approved by the FDA for the treatment of opioid use disorder.  Rosenthal Decl.

¶ 29.  The Substance Abuse and Mental Health Services Administration (SAMHSA) explains that "[t]he prescribed medication operates to normalize brain chemistry, block the euphoric effects of alcohol and opioids, relieve physiological cravings, and normalize body functions without the negative effects of the abused drug."  Rosenthal Ex. 33 at 1.  *Accord* Rosenthal Decl. ¶¶ 29-31; Potee Decl. ¶ 14.

The effectiveness of MAT in combating opioid use disorder has been well documented. MAT has been shown to decrease opioid use, opioid-related overdose deaths, criminal activity, and infectious disease transmission.  Rosenthal Decl. ¶ 27.  Other regimens, such as abstinence or twelve-step programs, have not proven successful, and studies have shown that maintenance medication treatments have a more robust effect on treatment efficacy than the behavior components of treatment.  *Id.* ¶ 28.  As a result, "[a] growing coalition of state and federal government agencies and physicians groups has advocated for increased access to MAT to combat the growing crisis of opioid addiction."  *Id.* ¶ 33.  The World Health Organization has deemed buprenorphine and methadone as "essential medicines" in the treatment of opioid use disorder.  *Id.* ¶ 30.  FDA has declared that "[i]mproving access to prevent, treatment and recovery services, including the full range of MAT, is a focus of FDA's ongoing work to reduce the scope of the opioid crisis and one part of the U.S. Department of Health and Human Services' Five-Point Strategy to Combat the Opioid Crisis."  *Id.* ¶ 27.  And SAMHSA has offered billions of dollars in federal grants to increase programs and support for MAT.  *Id.* ¶ 33.

**C.    Methadone Is Medically Necessary To Treat Mr. Pesce's Opioid Use Disorder.**

Mr. Pesce lives with his parents and five-year-old son in Ipswich, Massachusetts.  Pesce Decl. ¶¶ 1, 17, 19.  He is employed as a machinist and is a significant source of income for his family.  *Id.* ¶¶ 18, 19.

Mr. Pesce suffers from opioid use disorder.  Yuasa Decl. ¶ 10.  In the late 2000s, while he was employed in a machine shop, he was introduced to oxycodone by co-workers.  Pesce Decl. ¶ 7.  As his addiction progressed over several years, he lost his job, was forced to relinquish custody of his child to his parents, and became effectively homeless.  *Id.* ¶¶ 8-10; *see also* Richard Pesce Decl. ¶¶ 3-7.  He sold all of his possessions to buy oxycodone and ultimately turned in desperation to a cheaper alternative:  heroin.  Pesce Decl. ¶ 8.  He overdosed at least half a dozen times, and paramedics administered the anti-overdose medication Narcan on multiple occasions to save his life.  *Id.* ¶ 11.

Mr. Pesce spent years trying unsuccessfully to overcome his opioid use.  He enrolled in at least four detoxification programs and took medications such as buprenorphine and naltrexone. *Id.* ¶ 12.  None of these efforts was successful.  *Id.*  Detoxification without medication was ineffective, as Mr. Pesce would experience cravings so strong that he would leave the detox facility in search of drugs.  *Id.*  He found that he could not maintain a long-term recovery on either buprenorphine or naltrexone, which left him feeling sick and did not work.  *Id.*

Mr. Pesce was finally able to achieve active recovery in late 2016, when he was prescribed methadone as part of a substance abuse treatment program in Danvers, Massachusetts, which also includes counseling and other therapies.  *Id.* ¶¶ 14-22.  The daily dosage of methadone activates the opioid receptors in his brain and thereby suppresses drug cravings and opioid withdrawal symptoms.  *See* Potee Decl. ¶ 14; Rosenthal Decl. ¶ 30.  The methadone is administered orally in a liquid form similar to cough syrup.  Pesce Decl. ¶ 17.  Mr. Pesce has never experienced any adverse side effects from methadone.  *Id.* ¶ 21.  Mr. Pesce currently receives his daily methadone doses at the Lahey Behavioral Services facility in Danvers, Massachusetts, which is a five minute drive from Middleton HOC.  Yuasa Decl. ¶ 25; Richard

Pesce Decl. ¶ 13.  Mr. Pesce's prescribing physician at Lahey considers the continued administration of methadone to be medically and clinically required for the treatment of his opioid use disorder.  *See* Yuasa Decl. ¶¶ 11, 16, 17, 20.

As the result of receiving methadone, Mr. Pesce has now been in active recovery for almost two years, during which time he has not used illegal drugs.  Pesce Decl. ¶ 17; Yuasa Decl. ¶ 13.  He is employed again as a machinist, lives with his family and supports them financially, and is an attentive and caring parent.  Pesce Decl. ¶¶ 17-23.  Mr. Pesce wishes to remain in recovery for himself, his parents, and his son.  *Id.* ¶ 32.  As explained below, Defendants' policies jeopardize Mr. Pesce's health and recovery.

### D.    Mr. Pesce Is Expected To Report To Middleton HOC On Or About September 24, 2018, For A Period Of At Least 60 Days Of Incarceration.

Mr. Pesce's driver's license is revoked because in early 2016, prior to recovery, he was charged with operating a motor vehicle under the influence of a drug.  Pesce Decl. ¶ 24.  He took responsibility for this offense and entered a guilty plea in 2017, resulting in a 60-day sentence suspended until March 2019.  *Id.*

On July 19, 2018, Mr. Pesce's mother was unexpectedly unable to drive him to his methadone treatment due to the death of a neighbor.  *Id.* ¶ 25.  Desperate not to relapse, Mr. Pesce made the mistake of driving himself to treatment.  *Id.*  He was pulled over in Ipswich for driving six miles per hour over the speed limit, and he was charged with both speeding and driving with a license that had been suspended or revoked for operating under the influence of alcohol or drugs.  *Id.*  The latter charge carries a mandatory minimum sentence of 60 days' incarceration.  *See* Mass. Gen. Laws Ch. 90 § 23.  Because Mr. Pesce is being prosecuted in

Ipswich District Court, he is expected to serve his sentence in Middleton HOC, beginning on September 24, 2018.[1]

### E.    Absent Judicial Intervention, Middleton HOC Will Terminate Mr. Pesce's Methadone Treatment Contrary To The Standard Of Care.

As a matter of policy and practice, Middleton HOC does not provide MAT to inmates that suffer from opioid use disorder, even inmates that are in active recovery and have been prescribed medications such as methadone and buprenorphine prior to their incarceration. *See* Potee Decl. ¶¶ 16-18.  Once a patient is successfully recovering using methadone, the abrupt and involuntary cessation of the medication for reasons other than medical necessity is contrary to sound medical practice and prudent professional standards of care. *Id.* ¶ 15; Rosenthal Decl. ¶¶ 36-37; *see also* Yuasa Decl. ¶¶ 18-24.  Moreover, in the case of buprenorphine and methadone, which Mr. Pesce takes, sudden cessation of the medication will result in excruciating withdrawal symptoms, such as vomiting, diarrhea, body shakes, and an inability to sleep for weeks or even months at a time, which can lead to life-threatening complications.  Potee Decl. ¶ 18; Rosenthal Decl. ¶ 35; Yuasa Decl. ¶ 21.  The long term consequences of an abrupt stop to receiving medication are also severe. *See* Potee Decl. ¶¶ 19-22.  Forced withdrawal has been associated with severe depression, suicidal ideations, and decompensation—or the inability to maintain defense mechanisms in response to stress.  Rosenthal Decl. ¶ 35.

In addition, there is a high probability that the cessation of Mr. Pesce's prescribed methadone treatments will result in a relapse into opioid use either during or immediately following his incarceration, accompanied by elevated risk of overdose and death. *Id.* ¶ 36; Potee Decl. ¶¶ 19-22; Yuasa Decl. ¶¶ 22-24.  The statistics are jarring:  in one study, over 82 percent of

---

[1] Mr. Pesce's 60-day suspended sentence from the prior operating under the influence charge is likely to run concurrently with the sentence for his new charge and, in any event, would also be served at Middleton HOC.

patients who left methadone treatment relapsed to intravenous drug use within one year.
Rosenthal Decl. ¶ 36.

On September 12, 2018, Mr. Pesce's counsel sent a letter to the Essex County Sheriff and the Superintendent of Middleton HOC—Defendants Kevin Coppinger and Aaron Eastman— informing them of Mr. Pesce's serious medical need and requesting assurance that Mr. Pesce will be provided with MAT, specifically including methadone, when he is in their custody.  Ex. 2. The letter also specifically explained that the treatment is available a mere five-minute drive from the facility, at the Danvers center that Mr. Pesce currently attends.  *Id.*  The letter requested a response by Monday, September 17th, but neither Defendant responded.  Accordingly, the relevant officials at Middleton HOC are aware of Mr. Pesce's diagnosis and the medical necessity of continuing MAT, including the administration of methadone.  They are also aware that, even if it were somehow impossible to administer methadone within their facility, Mr. Pesce could be transported to the Danvers clinic to receive his methadone and back to the prison in a matter of minutes.  Nevertheless, it appears that, consistent with the facility's longstanding policy and practice, they do not intend to provide such treatment while he is incarcerated there beginning on or about September 24, 2018.

Middleton HOC's refusal to provide MAT to inmates stands in stark contrast to the positive results other correctional institutions have experienced by offering MAT to inmates.  As explained in the declaration submitted by Dr. Ruth Potee, the Medical Director of the Franklin County House of Correction (Franklin HOC) in Massachusetts, Franklin HOC has successfully provided buprenorphine to inmates that suffer from opioid use disorder since 2016 and is in the process of getting approval to administer methadone to inmates.  *See* Potee Decl. ¶¶ 17, 23-25. Similarly, the Massachusetts Correctional Institution in Framingham provides access to

methadone for pregnant inmates to avoid the medical risks associated with withdrawal.  *Id*. ¶ 17.
Correctional facilities throughout Rhode Island and at Rikers Island, New York also make MAT
available to their inmates.  *Id*. ¶ 26.  These programs have had a profoundly positive effect on the
inmates and surrounding communities.  After the initial implementation of MAT in 2016,
Franklin County saw a 35 percent drop in opioid overdose deaths between 2016 and 2017.  *Id*.
¶ 29.  In the same vein, a statewide study in Rhode Island found large and clinically meaningful
reductions in post-incarceration deaths from overdose among inmates released from
incarceration after the implementation of a comprehensive MAT program in a statewide
correction facility.  *Id*. ¶ 30.

The Massachusetts Legislature and Governor have also recognized the necessity and
practicality of MAT in jails and prisons.  In August 2018, Massachusetts enacted "An Act for
Prevention and Access to Appropriate Care and Treatment of Addiction."  *See* Acts of 2018, Ch.
208.  That Act establishes "a pilot program for the delivery of medication-assisted treatment for
opioid use disorder at the county correctional facilities located in Franklin, Hampden,
Hampshire, Middlesex and Norfolk counties."  *Id*. § 98.  Among other things, the pilot programs
will include "the capacity to possess, dispense and administer all drugs approved by the [FDA]"
for that purpose, which would include methadone.  *Id*.  The pilot programs will provide
"medication-assisted treatment to a person in the custody of the facility, in any status, who was
receiving medication-assisted treatment for opioid use disorder . . . by a valid prescription
immediately before incarceration," such as Mr. Pesce.  *Id*.  Unfortunately, however, the Act does
not include Essex County, and does not require correctional facilities to implement the pilot
programs until September 1, 2019, almost a year after Mr. Pesce will be sentenced.  *Id*.; Potee
Decl. ¶ 29.

9

## ARGUMENT

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits; that he is likely to suffer irreparable harm in the absence of preliminary relief; that the balance of equities tips in his favor; and that an injunction is in the public interest." *Winter v. Natural Resources Defense Council*, *Inc.,* 555 U.S. 7, 20 (2008). The same factors are used to determine a motion for a temporary restraining order. *See Largess v. Supreme Judicial Court for State of Massachusetts*, 317 F. Supp. 2d 77, 80 (D. Mass. 2004), *aff'd*, 373 F.3d 219 (1st Cir. 2004). In this case, all factors favor an injunction.

## I.   MR. PESCE IS LIKELY TO SUCCEED ON THE MERITS

### A.   Mr. Pesce Is Likely To Succeed In Showing That, In His Circumstances, The Denial Of Continued MAT Is Deliberate Indifference To Serious Medical Need That Violates The Eighth Amendment.

Mr. Pesce is likely to succeed on the merits of his Eighth Amendment claim that denying medication to treat his substance use disorder constitutes cruel and unusual punishment. Because "society takes from prisoners the means to provide for their own needs," prisoners "are dependent on the State for food, clothing, and necessary medical care." *Brown v. Plata*, 563 U.S. 493, 510 (2011). "Just as a prisoner may starve if not fed, he or she may suffer or die if not provided adequate medical care." *Id.* Prison officials therefore have an affirmative obligation under the Eighth Amendment to provide prisoners with the necessities of life, including medical care. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Helling v. McKinney*, 509 U.S. 25, 31-32 (1993); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "A prison that deprives prisoners of basic sustenance, including adequate medical care, is incompatible with the concept of human dignity and has no place in civilized society." *Brown*, 563 U.S. at 511.

Consequently, the Eighth Amendment is deemed violated upon a showing that (1) an inmate suffers from an objectively "serious" medical condition to which (2) an agent acting

under color of state law was deliberately and subjectively indifferent. *Kosilek v. Spencer*, 774 F.3d 63, 82 (1st Cir. 2014) (en banc). Here, Mr. Pesce is likely to prove that his opioid use disorder constitutes a serious medical need, and that the arbitrary and sudden withholding of his prescribed medication to treat that need will constitute deliberate indifference by the Defendants.

### 1. Opioid Use Disorder Is An Objectively Serious Illness.

"A medical need is 'serious' if it is one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Miranda-Rivera v. Toledo-Davila*, 813 F.3d 64, 74 (1st Cir. 2016) (quotations omitted) (applying Eighth Amendment standard to arrestee's due process claim arising from drug overdose). Here, Mr. Pesce's opioid use disorder is an objectively serious illness. His physician has diagnosed the disorder and mandated treatment, including with prescription medication. *See* Yuasa Decl. ¶¶ 10-13, 15-17. Courts have held that failure to provide methadone poses an "objectively serious" danger to inmates. *See, e.g.*, *Davis v. Carter*, 452 F.3d 686, 695-96 (7th Cir. 2006); *Foelker v. Outagamie County*, 394 F.3d 510, 513 (7th Cir. 2005). And even a lay person would recognize that a chronic brain disease that destroyed Mr. Pesce's life once before, and that kills roughly six people per day in the Commonwealth, creates a "necessity for a doctor's attention."

Mr. Pesce's medical need is serious even though he has not yet been remanded to Middleton HOC's custody and is currently in remission. The Constitution does not require that Mr. Pesce "await the consummation of a threatened injury" or "await a tragic event" to obtain injunctive relief. *See Farmer*, 511 U.S. at 845 (citations and internal quotation marks omitted). Rather, it is sufficient that he face "[a] significant risk of future harm that prison administrators fail to mitigate." *See Kosilek*, 774 F.3d at 85-86; *see also Helling v. McKinney*, 509 U.S. 25, 33 (1993) ("It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-

threatening condition in their prison on the ground that nothing yet had happened to them.").  It is enough that, absent injunctive relief, Defendants will imminently, arbitrarily, and abruptly terminate Mr. Pesce's access to his physician-prescribed, medically necessary medication for a chronic life-threatening disorder, which also will trigger painful withdrawal symptoms that threaten Mr. Pesce's recovery.  Such actions are completely outside the boundaries of modern medicine and grossly inconsistent with the applicable standard of care.  *See Kosilek*, 774 F.3d at 82 (prison medical services required to "be at a level reasonably commensurate with modern medical science and of a quality acceptable within prudent professional standards").

Indeed, MAT is widely recognized as the medical standard of care for treatment of opioid use disorder.  *See* Rosenthal Decl. ¶¶ 26-27; Potee Decl. ¶ 13; Yuasa Decl. ¶ 7.  As explained above, FDA, the Department of Health and Human Services, the World Health Organization, and SAMHSA all recognize MAT to be the standard of care.  *See supra* at 4.  As early as 2002, FDA had recognized that buprenorphine and Suboxone "have been studied in over 2,000 patients and shown to be safe and effective treatments for opiate dependence."  Ex. 3.  A review from the World Health Organization likewise found that "substitution maintenance therapy is one of the most effective treatment options for opioid dependence."  Ex. 4 at 7.  MAT has also been recognized as the standard of care within the prison and jail context.  The President's Commission on Combating Drug Addiction and the Opioid Crisis found MAT is associated with reduced mortality following release from prison and with "other positive outcomes."  Ex. 5 at 72.[2]  The American Society of Addiction Medicine, the leading professional society in the country on addiction medicine, also recommends treatment with MAT for people with opioid use disorder in the criminal justice system.  *See* Ex. 6.  The National Commission on Correctional

---

[2]  The Commission citing a study finding that "individuals receiving MAT were 75% less likely to die of any cause and 85% less likely to die of drug poisoning in the first month after release."  *Id*.

Health Care has also adopted a position statement calling for the "continuation of prescribed medications for substance use disorders," such as buprenorphine and methadone.[3]  The United States Department of Justice's Adult Drug Court Discretionary Grant Program has gone even further, requiring grantees to permit the use of MAT.  Ex. 7.

This is not a case where "two alternative courses of treatment exist, and both alleviate negative effects within the boundaries of modern medicine."  *Cf. Kosilek*, 774 F.3d at 90.  In *Kosilek*, for example, the First Circuit found that a prisoner diagnosed with Gender Identity Disorder could reasonably be treated with either a combination of medications and therapy or sex-reassignment surgery, and the prison was therefore free to choose between these alternatives.  *See id.* at 90.  Here, in sharp contrast, Middleton HOC will not provide any treatment *at all*,[4] absent a court order—forcing Mr. Pesce to "white knuckle" through withdrawal.  *See* Yuasa Decl. ¶ 18.  But even if Middleton HOC would provide treatment, there is no reasonable alternative to methadone, given that (1) buprenorphine and naltrexone have already been ineffective for Mr. Pesce, (2) Mr. Pesce has had tremendous success with methadone, and (3) Mr. Pesce is at high risk for dangerous withdrawal and relapse if methadone is suddenly and arbitrarily withdrawn.  Pesce Decl. ¶¶ 12, 14-23; Yuasa Decl. ¶¶ 11, 13, 20-24.  For Mr. Pesce, continued MAT with methadone is the only treatment that satisfies prudent professional standards.  *See* Yuasa Decl. ¶¶ 11, 20, 27; Potee Decl. ¶15.

---

[3] National Commission on Correctional Health Care, Substance Use Disorder Treatment for Adults and Adolescents, https://www.ncchc.org/substance-use-disorder-treatment-for-adults-and-adolescents (last visited Sept. 18, 2018).

[4] Plaintiff's counsel understands that Middleton HOC may provide one shot of Vivitrol within 48 hours of release to certain inmates as part of "reentry services."  Even if Mr. Pesce receives that shot, it has already proven ineffective in his case.  *See* Pesce Decl.¶ 12.

2. *Refusing To Treat Mr. Pesce's Opioid Use Disorder, And Arbitrarily And Abruptly Discontinuing His Physician-Prescribed Medication, Will Constitute Deliberate Indifference.*

Defendants are deliberately indifferent in refusing to continue Mr. Pesce's current medication-assisted treatment in prison, and instead ceasing to administer his medication, which will precipitate a medical crisis. Defendants have been personally notified of Mr. Pesce's serious predicament, yet have remained silent and deliberately indifferent to his condition. *See* Ex. 2.

Although prison officials might not be deliberately indifferent if they "make judgments balancing security and health concerns that are within the realm of reason and made in good faith," *see Kosilek*, 774 F.3d at 92, that is not the situation here. There is no evidence that Defendants have ever identified any legitimate security concerns regarding the oral administration of methadone, much less weighed them in any fashion against Mr. Pesce's need for treatment. Nor can they. It is clear that MAT is administrable in a prison setting. Numerous jails and prisons in Massachusetts and elsewhere have implemented MAT policies that allow inmates to continue treatment with buprenorphine and methadone. *See* Potee Decl. ¶¶ 24-28. The Governor and State Legislature have called for increasing access to MAT in correctional facilities throughout the Commonwealth. *See supra* at 9. And institutions such as the National Commission on Correctional Health Care, have adopted policies calling for the continuation of prescription medications for substance use disorders. *Id.*

Finally, even if Middleton HOC does not want to administer the methadone through its own healthcare system, in this case Mr. Pesce's current provider is a mere five-minute drive from Middleton HOC. Yuasa Decl. ¶ 25; Richard Pesce Decl. ¶ 13. Correction officials can simply transport Mr. Pesce to his current provider or contract with a local licensed opioid treatment program to provide the necessary medication and staff to administer his treatment. Potee Decl. ¶ 28; Yuasa Decl. ¶ 25. This approach has been widely adopted by correctional

14

facilities in Rhode Island.  Potee Decl. ¶ 28.  If Middleton HOC will not administer Mr. Pesce's necessary medications, it cannot constitutionally refuse to transport him mere minutes away to a facility that will.

**B.      Mr. Pesce Is Likely To Succeed On The Merits Of His ADA Claim.**

Mr. Pesce is also likely to succeed on the merits of his statutory claim that denying him access to medical services because of his opioid use disorder constitutes unlawful discrimination under the ADA. The ADA prohibits a public entity from discriminating against a qualified individual with a disability on the basis of that disability.  42 U.S.C. § 12132.  As instrumentalities of state and local government, Massachusetts Houses of Correction are "public entit[ies]" subject to Title II of the ADA.  42 U.S.C. § 12131(1)(B); *Pennsylvania Dep't of Corrections v. Yeskey*, 524 U.S. 206, 210 (1998).  To prove a violation of Title II, a plaintiff must show: "(1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities or was otherwise … discriminated against; and (3) that such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability."  *Buchanan v. Maine*, 469 F.3d 158, 170–71 (1st Cir. 2006).  Each element is satisfied here.

*1.      Mr. Pesce Is A Qualified Individual With A Disability.*

Individuals in recovery from diagnosed substance use disorder, including Mr. Pesce, are "qualified individuals with disabilities" under the ADA.  *See* 42 U.S.C. §§ 12102, 12131(2).  *Cf.* 42 U.S.C. § 12210.  The term "disability" includes "a physical or mental impairment that substantially limits one or more major life activities of such individual."  42 U.S.C. § 12102.  By regulation, the phrase "physical or mental impairment includes, but is not limited to . . . drug

addiction, and alcoholism." 28 C.F.R. § 35.108(b)(2).[5] "Unquestionably, drug addiction constitutes an impairment under the ADA." *A Helping Hand, LLC v. Baltimore Cnty., Md.*, 515 F.3d 356, 367 (4th Cir. 2008). Therefore, individuals recovering from opioid use disorder, a drug addiction condition, qualify for protection. *See id.*; *see generally* 42 U.S.C. § 12102(1)(C) (defining "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment").

Mr. Pesce's disability is severe and chronic. Yuasa Decl. ¶¶ 1, 10; *see also* Rosenthal Decl. ¶¶ 8-17; Potee Decl. ¶ 6. There is substantial evidence that his opioid use disorder "substantially limits" his major life activities, such as caring for oneself, learning, concentrating, thinking, communicating, and working. *See* Pesce Decl. ¶¶ 8-13; Rosenthal Decl. ¶ 11-15. Mr. Pesce therefore qualifies for protection under the ADA.[6]

      2.    *Mr. Pesce Will Be Denied The Benefit Of Health Care Programs And Discriminated Against Because Of His Disability.*

Mr. Pesce also satisfies the second and third elements for demonstrating an ADA violation, namely, that he was either denied benefits of the public entity's services or discriminated against because of his disability. *See Buchanan*, 469 F.3d at 170–71. By not administering MAT, the standard of care for opioid use disorder (*see* Rosenthal Decl. ¶ 26-27; Potee Decl. ¶ 13; Yuasa Decl. ¶ 7), Defendants deny Mr. Pesce the benefits of the facilities' health care programs and discriminate against him because of his disability.

The ADA provides that no qualified individual with a disability shall, by reason of that

---

[5] *See also Bragdon v. Abbott*, 524 U.S. 624, 633 (1998); *Jones v. City of Boston*, 752 F.3d 38, 58 (1st Cir. 2014).

[6] In the alternative, prior cases have considered whether "the United States Department of Justice has construed drug addiction as a *per se* disabling impairment pursuant to the ADA." *CRC Health Grp., Inc. v. Town of Warren*, No. 2:11-CV-196-DBH, 2014 WL 2444435, at *10 (D. Me. Apr. 1, 2014). Such a theory provides additional support for holding Mr. Pesce to be disabled under the ADA.

disability, be excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by any such entity. 42 U.S.C. § 12132. Under this standard, medical care is a service provided by jails and prisons from which disabled prisoners must not be excluded or subjected to discrimination. *Yeskey*, 524 U.S. at 210 (citing, *e.g.*, *Hudson v. Palmer*, 468 U.S. 517, 552 (1984); *Olim v. Wakinekona*, 461 U.S. 238, 246 (1983)). Defendants' policy of refusing to administer MAT to Mr. Pesce violates the ADA for three reasons.

*First*, Defendants violate the ADA by withholding medical treatment for opioid use disorder. This is especially true for an inmate who is already receiving the standard of care upon admission and, thus, eligible to benefit from continuity-of-care policies as outlined by the Massachusetts Department of Corrections and implemented at most correctional facilities. *See* Potee Decl. ¶¶ 18 & n.5, 31. By withhold treatment for opioid use disorder, Defendants force patients to discontinue treatment and undergo painful and dangerous withdrawal. *See id.* ¶¶ 18-22; Rosenthal Decl. ¶¶ 34-37; Yuasa Decl. ¶¶ 18-24. They do so even though MAT is the standard of care for opioid replacement therapy and forced withdrawal is not medically appropriate—especially for patients as successful as Mr. Pesce. *See* Rosenthal Decl. ¶¶ 26-27, 36-37; Potee Decl. ¶ 15; Yuasa Decl. ¶¶ 19, 20. To the contrary, forced withdrawal disrupts patients' treatment plans, increases the risk of relapse into active addiction, and makes patients more likely to suffer from overdose and potential death. *See id.* In short, Defendants' policy withholds medical treatment for opioid use disorder, and thereby violates the ADA.

*Second*, Defendants violate the ADA by discriminating "amongst classes of the disabled." *Iwata v. Intel Corp.*, 349 F. Supp. 2d 135, 148-49 (D. Mass. 2004) (citing *Olmstead v. L.C.*, 527 U.S. 581 (1999)). If Mr. Pesce suffered from asthma, bipolar disorder, diabetes,

17

epilepsy, fibromyalgia, gastritis, hypertension, or any number of other chronic health conditions requiring regular medication for treatment, Defendants would not hesitate to assure Mr. Pesce that his medical needs would be met.  But because Mr. Pesce suffers from opioid use disorder, he will be denied care.  Opioid use disorder is no less serious, and treatment no less necessary, than other chronic conditions like diabetes.  *See* Yuasa Decl. ¶ 20.

*Third*, Defendants' policies also discriminate against Mr. Pesce by withholding reasonable accommodation for his disability.  "Discrimination" includes the failure to make reasonable accommodations for a qualified individual with a disability.  *See, e.g.*, *Henrietta D. v. Bloomberg*, 331 F.3d 261, 273 (2d Cir. 2003); 42 U.S.C. § 12112(b)(5)(A).  Mr. Pesce has requested a reasonable accommodation for his opioid use disorder—namely, medication-assisted treatment.  Defendants' policies to instead require forced withdrawal do not qualify as reasonable accommodation.  For this reason, too, the policies violate the ADA.

This discrimination goes to the core of the ADA, especially during the ongoing opioid crisis.  It is therefore not surprising that the Department of Justice recently initiated an ADA investigation into the failure of Massachusetts's corrections facilities to provide MAT.[7]  *See* Ex. 8.  That investigation focuses on the facilities' refusal to provide MAT even to prisoners whose opioid use disorder "has been identified as requiring" MAT prior to confinement—exactly the position of Mr. Pesce.  As the investigatory letter explained, "all individuals in treatment" for opioid use disorder are "protected by the ADA, and [Massachusetts Department of Corrections] has existing obligations to accommodate this disability."  *Id.*[8]

---

[7]  Plaintiff's counsel understand that the investigation is ongoing.

[8]  In another example, the U.S. Attorney's office for the District of Massachusetts recently settled an ADA lawsuit against a nursing facility that refused to accept a patient who was being treated for opioid use disorder. As explained in by the U.S. Attorney, the opioid epidemic is a deadly public health crisis, and "now more than ever, individuals in recovery must not face discriminatory barriers to treatment." *U.S. Attorney's Office Settles Disability Discrimination Allegations at Skilled Nursing Facility*, UNITED STATES ATTORNEY'S OFFICE FOR THE DISTRICT OF MASSACHUSETTS

## II.    MR. PESCE WILL SUFFER IMMEDIATE IRREPARABLE INJURY IF HE IS DENIED ACCESS TO MAT WHILE INCARCERATED.

Mr. Pesce will suffer irreparable harm unless he is able to continue his MAT treatment while he is incarcerated beginning on or about September 24, 2018.  "'Irreparable injury' in the preliminary injunction context means an injury that cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy."  *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005).  Absent injunctive relief, Defendants' policies would force Mr. Pesce into acute withdrawal with painful physical symptoms and create a high risk of relapse.  *See* Rosenthal Decl. ¶¶ 34-37; Potee Decl. ¶¶ 18-22; Yuasa Decl. ¶¶ 18-24.  Mr. Pesce knows first-hand the physiological and physical consequences of withdrawal and is already experiencing anxiety and insomnia in anticipation that the Commonwealth will force him to suffer through that experience again.  *See* Pesce Decl. ¶¶ 27-29; Richard Pesce Decl. ¶ 11.

Forced withdrawal also places patients at greater risk of overdose and death.  "Death is three times as likely for people out of treatment versus when in treatment."  Rosenthal Decl. ¶ 36.  The long-term effects of withdrawal include a high risk of overdose because the patient is no longer in remission and the patient's tolerance to narcotics is gone.  Rosenthal Decl. ¶ 36; Potee Decl. ¶ 22; Yuasa Decl. ¶ 24.  Beyond the troubling statistics, both Mr. Pesce and his father personally know the potentially fatal consequences of relapse and overdose.  Pesce Decl.¶¶ 30-31; Richard Pesce Decl. ¶ 12.  No sum of money or subsequent equitable relief could compensate Mr. Pesce for those harms.  *See, e.g.*, *Chambers v. NH Prison,* 562 F. Supp. 2d 197, 202 (D.N.H. 2007) (denial of ready access to dental care caused irreparable harm); *Farnam v. Walker*, 593 F. Supp. 2d 1000, 1013 (C.D. Ill. 2009) (delay of treatment constitutes irreparable

(May 10, 2018), https://www.justice.gov/usao-ma/pr/us-attorney-s-office-settles-disability-discrimination-allegations-skilled-nursing (last viewed Sept. 19, 2018).

injury due to reduction in life expectancy and negative impact on quality of life).

## III.   THE BALANCE OF HARMS AND PUBLIC INTEREST STRONGLY FAVOR THE GRANT OF EMERGENCY INJUNCTIVE RELIEF.

The irreparable, and potentially permanent, harm suffered by Mr. Pesce absent relief greatly outweighs any potential harm claimed by defendants.  Unlike the imminent pain and psychological distress that Mr. Pesce would suffer absent the injunction, granting injunctive relief would impose no measurable harm on Defendants aside from the cost of providing MAT— which is extremely cost-effective.  Potee Decl. ¶ 27.  In any event, Defendants cannot deny healthcare based on budgetary restrictions.  *See, e.g., Boswell v. Sherburne County*, 849 F.2d 1117, 1123 (8th Cir. 1988); *Ancata v. Prison Health Svcs., Inc.*, 769 F.2d 700, 705 (11th Cir. 1985).

The public interest also favors Mr. Pesce's requested injunctive relief.  Defendants' policy of denying MAT, even to people with existing prescriptions, provides one more barrier to effective treatment for those suffering from opioid use disorder, enhancing rather than ameliorating Massachusetts's ongoing opioid crisis.  Indeed, Defendants' policies worsen that crisis by disrupting effective treatment and making relapse and potential overdose more likely.  Providing injunctive relief for Mr. Pesce would be one small step towards continuous treatment for vulnerable prisoners who suffer from opioid use disorder, and would thus serve the public interest in combating the opioid crisis.

## CONCLUSION

This Court should issue a Temporary Restraining Order and Preliminary Injunction requiring Defendants to provide methadone to Mr. Pesce, or otherwise make methadone available to him by transporting him to the nearby methadone treatment facility, upon admission to the Middleton HOC on or about September 24, 2018, and throughout his incarceration.

Respectfully submitted,

GEOFFREY PESCE,

By his attorneys,


*/s/ Robert Frederickson III*
Robert Frederickson III (BBO 670111)
Michael Pickett (BBO 698618)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, Massachusetts 02210
Tel.:  617.570.1000
Fax.:  617.523.1231
RFrederickson@goodwinlaw.com
MPickett@goodwinlaw.com

Ira Levy (*Pro hac vice* pending)
Alexandra Valenti (*Pro hac vice* pending)
Jenny Zhang (BBO 689838)
GOODWIN PROCTER LLP
The New York Times Building
620 Eight Avenue
New York, NY 10018
Tel.:  212.813.8800
Fax.:  212.355.3333
ILevy@goodwinlaw.com
AValenti@goodwinlaw.com
JZhang@goodwinlaw.com

Matthew R. Segal (BBO # 654489)
Jessie J. Rossman (BBO # 670685)
Daniel L. McFadden (BBO # 676612)
American Civil Liberties Union
Foundation of Massachusetts, Inc.
211 Congress Street
Boston, MA 02110
Tel.:  (617) 482-3170
msegal@aclum.org
jrossman@aclum.org
dmcfadden@aclum.org

*Attorneys for Plaintiff*

Dated:  September 19, 2018