UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

C.A. No. 18-cv-11972-DJC

GEOFFREY PESCE,

       Plaintiff,

v.

KEVIN F. COPPINGER, in his official
capacity as Essex County Sheriff,
AARON EASTMAN, in his official
capacity as Superintendent of the Essex
County House of Corrections - Middleton,

       Defendants

**DEFENDANTS KEVIN F. COPPINGER AND
AARON EASTMAN'S MEMORANDUM OF LAW IN SUPPORT
OF THEIR OPPOSITION TO
PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION**

## I.      STATEMENT OF THE CASE

Plaintiff has filed a two-count Complaint seeking both a Temporary Restraining Order and

Preliminary and Permanent Injunctive Relief.   Specifically, Plaintiff asks this Court to order the

Defendants to provide Methadone to him upon his *possible future* admission to the Essex County

Sheriff's Department ("ECSD"), alleging that the failure to provide same is both a violation of the

Eighth Amendment to the U.S. Constitution pursuant to 42 USC Section 1983 (Count I) as well

as a violation of the Americans with Disabilities Act ("ADA") (Count II).

Both because Plaintiff's request is not ripe for judicial consideration, and because he

fails to establish the necessary conditions precedent for the issuance of the extraordinary relief

requested, the motion must be denied.

1

## II.    STATEMENT OF THE FACTS

The Plaintiff suffers from opiate addiction—more specifically, "opiate use disorder"—(*Complaint, paragraph 51*) which he alleges can only be controlled medically by the use of an opiate replacement drug, Methadone, through what is referred to as "medicated assisted therapy" ("MAT").  (*Id.*, paragraphs 3-4).   Plaintiff has been on a Methadone treatment program since 2016 (*Id.*).

Plaintiff expects to serve a term of imprisonment of 60 days in ECSD beginning on December 3, 2018 or January 14, 2019 [1] (*Joint Statement Regarding Briefing and Hearing Schedule, p.2*) during which he will not have access to Methadone pursuant to his treatment program.  Nonetheless, Plaintiff wants the Defendants to continue his Methadone treatment either at ECSD or transport him to a facility that can continue his Methadone treatment because right now ECSD "categorically and arbitrarily denies all male prisoners access to MAT for the treatment of opiate use disorder…and has no plans to alter this policy in the foreseeable future." (*Complaint, paragraph 43*).

## III.    STANDARD OF REVIEW

For injunctive relief to issue, a plaintiff must prove:

(1) that [he] has a substantial likelihood of success on the merits; (2) that [he] faces a significant potential for irreparable harm in the absence of immediate relief; (3) that the ebb and flow of possible hardships are in favorable juxtaposition (i.e., that the issuance of an injunction will

---

[1] The Plaintiff is a Defendant in Ipswich District Court where he is charged with driving with a suspended license, and which is scheduled for trial on January 14, 2019. However, Plaintiff is also a Defendant in Lynn District Court where he received probation on a charge of operating under the influence.  Plaintiff anticipates he will be found guilty of a probation violation in the latter criminal case at his next court appearance in that matter, scheduled for December 3, 2018,  and thereafter will be immediately incarcerated at ECSD.  *See the parties Joint Statement Regarding Briefing and Hearing Schedule, p.2.*

not impose more of a burden on the non-movant than its absence will impose on the movant, (known as  the balance of equities between the parties); and (4) that the granting of prompt injunctive relief will promote (or, at least, not denigrate) the public interest.  *McGuire v. Reilly*, 260 F.3d 36, 42 (1st Cir. 2001).

## IV.    ARGUMENT

### PLAINTIFF'S MOTION SHOULD BE DENIED BECAUSE HIS CLAIM IS NOT RIPE FOR ADJUDICATION AND HE HAS NOT ESTABLISHED THE NECESSARY CONDITIONS FOR INJUNCTIVE RELIEF

#### A.    PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION IS NOT RIPE  FOR DETERMINATION AT THIS TIME.

"Determining ripeness involves a dual inquiry: evaluation of both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.  Both prongs of the test must be satisfied, although a strong showing on one may compensate for a weak one on the other."  *McInnis-Misenor v. Me. Med. Ctr.*, 319 F.3d 63, 70 (1st Cir. 2003).   "[T]he critical question concerning fitness for review is whether the claim involves uncertain and contingent events that may not occur as anticipated or may not occur at all."  *Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530, 536 (1st Cir. 1995).   "The hardship prong evaluates the extent to which withholding judgment will impose hardship -- an inquiry that typically turns upon whether the challenged action creates a direct and immediate dilemma for the parties. . . .This inquiry encompasses the question of whether plaintiff is suffering any present injury from a future contemplated event."  *McInnis-Misenor, 319 F.3d 63 at 70* (citations and quotations omitted).  "[P]remature review not only can involve judges in deciding issues in a context not sufficiently concrete to allow for focus and intelligent analysis, but it also can involve them in deciding issues

3

unnecessarily, wasting time and effort." *W.R. Grace & Co. v. United States EPA*, 959 F.2d 360, 366 (1st Cir. 1992).

In this case, Plaintiff's request for injunctive relief is based on uncertain future events that may or may not occur.   There is uncertainty about what sentence the Plaintiff will receive at both his probation  revocation hearing at Lynn District Court on December 3, 2018 and his criminal matter at Ipswich District Court on January 14, 2019.    A continuance of that hearing or an outcome different  than  incarceration  are possibilities.    Given the uncertainty of what will occur on December 3, 2018 and January 14, 2019, this action is premature and should be dismissed.

**B.    PLAINTIFF CANNOT PROVE AN EIGHTH AMENDMENT NOR ADA VIOLATION OR THAT HE WILL SUFFER IRREPARABLE HARM**

1.    *The Plaintiff has not demonstrated that he is likely to succeed on the merits of an Eighth Amendment or ADA Claim.*

A denial of medical care claim requires evidence of deliberate indifference to a serious medical need of the inmate.   See *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  "To succeed on an Eighth Amendment claim based on inadequate or delayed medical care, a plaintiff must satisfy both a subjective and objective inquiry: he must show first, 'that prison officials possessed a sufficiently culpable state of mind, namely one of 'deliberate indifference' to an inmate's health or safety,' and second, that the deprivation alleged was 'objectively, sufficiently serious.'" *Leavitt v. Corr. Med. Servs.*, 645 F.3d 484, 497 (1st Cir. 2011) (citing *Burrell v. Hampshire Cty.,* 307 F.3d 1, 8 (1st Cir. 2002)).   "The standard encompasses a narrow band of conduct: subpar care amounting to negligence or even malpractice does not give rise to a constitutional claim, rather, the treatment provided must have been so inadequate as to constitute an unnecessary and wanton

infliction of pain or to be repugnant to the conscience of mankind." *Leavitt*, 645 F.3d at 497 (citations and quotations omitted).   Jails are "by no means required to tailor a perfect plan for every inmate; while it is constitutionally obligated to provide medical services to inmates, these services need only be on a level reasonably commensurate with modern medical science and of a quality acceptable within prudent professional standards." *United States v. Derbes*, 369 F.3d 579, 583 (1st Cir. 2004) (citations and quotations omitted).

ECSD has determined the best course of treatment for heroin or other opioid addiction is to provide inmates with non-opioid treatment and programmatic services to address drug abuse so that when they return to the community they are drug-free, and will not re-offend, thus reducing recidivism.   Detoxification, treatment,  education and inmate accountability are its core themes. (*Affidavit of Jason Faro, para. 2*).  Part of the treatment is MAT—but it is with the non-opioid drug Vivitrol because under federal law, Methadone is a Schedule II opiate that produces many of the same effects as heroin and thus users risk becoming tolerant of and physically dependent on the drug.[2]  Deaths from opioids have increased more than 300% in the last 20 years.[3]  Methadone in particular is responsible for nearly one in four opioid-related deaths.[4]  In essence, continuing a user's addiction by simply switching to another dangerous drug does not get the user closer to being drug-free.

Moreover, opioids are addictive and misuse can cause addiction, overdose or death. Common Methadone side effects include dizziness, drowsiness, nausea, vomiting, and increased

---

[2] U.S. Department of Justice and Drug Enforcement Agency, *Drugs of Abuse, A DEA Resource Guide, 2017 Edition*, https://www.dea.gov/sites/default/files/sites/getsmartaboutdrugs.com/files/publications/DoA_2017Ed_Updated_6.16.17.pdf#page=44.
[3] Faul M., Bohm M., Alexander C., Methadone Prescribing and Overdose and the Association with Medicaid Preferred Drug List Policies — United States, 2007–2014. Centers for Disease Control and Prevention.
[4] Id.

sweating.[5]  Fatal side effects can occur if used in combination with alcohol or other

sedatives/central nervous system depressants.  Methadone has also been known to cause a life-

threatening heart rhythm disorder.  Methadone has also been known to cause serotonin syndrome;

symptoms include agitation, hallucinations, fever, sweating, shivering, fast heart rate, muscle

stiffness, twitching, loss of coordination, nausea, vomiting, constipation or diarrhea.  *Id.*

As such, the *Federal Bureau of Prisons Clinical Practice Guidelines for Detoxification of*

*Chemically Dependent Inmates* does not make any recommendations with respect to Methadone

maintenance treatment.[6]  It states that "medical detoxification is considered the standard of care for

individuals with opiate dependence."[7]  Further, the *CDC Guideline for Prescribing Opioids for*

*Chronic Pain* recommends that Methadone should not be the first choice for an extended-

release/long acting opioid.[8]   As such, and consistent with widely-accepted medical standards*, there*

*is no correctional facility in Massachusetts providing Methadone to male inmates.*

Recent research data supports the fact that a MAT program that uses Vivitrol rather than an

opioid like Methadone is effective.   Results of a 2017 clinical trial published in the *Journal of*

*American Medical Association* show a finding that an extended release of Vivitrol was as effective

as opioids in maintaining short-term abstinence from heroin and other illicit substances, and should

be considered as a treatment option for opioid-dependent individuals.[9]

---

[5] https://www.webmd.com/mental-health/addiction/what-is-Methadone#1
[6] Fed. Bureau of Prisons, Clinical Practice Guidelines: Detoxification of Chemically Dependent Inmates 14-16 (Aug. 2009).
[7] 30 Id. at 14.
[8] Dowell D, Haegerich TM, Chou R. CDC guideline for prescribing opioids for chronic pain—United States, 2016. MMWR Recomm Rep 2016;65(No. RR-1). https://doi.org/10.15585/mmwr.rr6501e1.
[9]  See Exhibit A, *Journal of American Medical Association* "Effectiveness of Injectable Extended-Release Naltrexone vs Daily Buprenorphine-Naloxone for Opioid Dependence: A Randomized Clinical Noninferiority Trial"

Similarly, a 2017 clinical trial in the *Journal of Substance Abuse Treatment* concluded that taking Vivitrol prior to leaving jail for opioid use disorder increases the treatment retention rate as compared to commencing after release.[10]   An article in the same publication in 2015 showed that the use of Vivitrol for both alcohol and opioid problems in Missouri prisoners showed that those receiving Vivitrol had longer duration of care and were more likely to become abstinent compared to opioid based substances.[11]

Moreover, an article in the *New England Journal of Medicine* in 2016 indicated that a trial study of extended release Vivitrol is effective for the prevention of relapse to opioid dependents. [12] A 2015 article in the *Journal of Acquired Immune Deficiency Syndromes* indicated the effectiveness of Vivitrol in maintaining viral suppression among incarcerated individuals living with HIV with opioid use disorder who are transitioning to the community.[13]   A 2016 study concluded that in preventing opioid relapse, both Vivitrol and Buprenorphine were equally safe and effective. [14]

In addition, there are safety and security reasons for banning opioids at the Middleton

---

[10]  Exhibit B, *Journal of Substance Abuse Treatment*  "Extended-release naltrexone for opioid use disorder started during or following incarceration ."

[11] Exhibit C, *Journal of Substance Abuse Treatment*  "Extended-Release Naltrexone for Alcohol and Opioid Problems in Missouri Parolees and Probationers."

[12] Exhibit D, *New England Journal of Medicine*  "Extended-Release Naltrexone to Prevent Opioid Relapse in Criminal Justice Offenders"

[13] Exhibit E, *Journal of Acquired Immune Deficiency Syndromes*  "Extended-Release Naltrexone Improves Viral Suppression among Incarcerated Persons Living with HIV with Opioid Use Disorders Transitioning to the Community: Results of a Double-Blind, Placebo-Controlled Randomized Trial"

[14] Exhibit F, "Comparative effectiveness of extended-release naltrexone versus buprenorphine-naloxone for opioid relapse prevention: a multicentre, open-label, randomized controlled trial ."

facility.  The Plaintiff would not be provided Methadone as opioids are specifically prohibited from the ECSD because they are widely known to be coveted within populations of incarcerated individuals for their intoxicating effects.   As outlined in the *Affidavit of Superintendent Aaron Eastman*, ECSD, like many jails and prisons nationwide, has experienced serious problems due to the presence of opioids.   Opioids are so desired in the inmate population that inmates have been known to attempt to smuggle them in their dentures, to obtain them through contact visits, and even to have them diluted and mailed to them in the form of pictures and letters, or as part of the adhesive that seals envelopes.   In addition, inmates are well-known to hoard medication that they are prescribed and administered within the jail through "cheeking" and other means.   Inmates like the Plaintiff who are prescribed drugs for legitimate reasons have been known to willingly hide it and provide it to other prisoners.  *Eastman Affidavit, paras. 14, 15.*  And Plaintiff's desired alternative to treatment in the jail, i.e.,  transportation to a drug clinic, poses an increased risk of escape and/or third-party intervention.  *Id., paras. 17, 18.*   The *Eastman Affidavit*  is intended simply for the purpose of demonstrating safety and security problems associated with the presence of opioids in incarcerated populations, and the lengths to which inmates will go to obtain them.

Even inmates describe controlled opioid treatment in jail as being both dangerous and ineffective.  As recently as August of 2018, inmates in Barnstable County warned about the dangers of opioid treatment in jail (in this case, suboxone), calling it a "horrible idea to introduce into the facility" and one that led to "chaos—fights, gambling, people calling home to their families to try to get money so they could give it to another inmate to get suboxone…" *Exhibit G*; *see video at https://www.youtube.com/watch?v=UfORP9w47XA*).

At ECSD, inmates are first assessed by a medical professional upon admission to the facility. *Affidavit of Deanna Kiser, R.N.* Inmates who are addicted to opiates are provided with Motrin for pain, Bentyl for stomach cramps, Imodium for diarrhea, Zofran for nausea, Maalox for indigestion. *Id. at paras. 6.* All necessary accommodations to make their withdrawal as safe and comfortable as possible are implemented. *Id. at para. 7.* From their admission into the facility until withdrawal is complete, inmates are carefully monitored by medical staff. *Id.* Mental health clinicians, educators and program staff are also available to assist inmates in cleansing themselves from drug addiction and providing them with counseling, education and programming to assist in that process. *Faro, Kiser Affidavits.* Vivitrol is prescribed at the end of the addiction treatment program, after the inmate has completed withdrawal, received treatment, education and counseling, and been provided with continued post-incarceration rehabilitative and educational services to remain opioid-free. *Kiser Affidavit, para. 10.* Initial detoxification is important for a medically assisted treatment program employing Vivitrol. Vivitrol has been effective in allowing patients to transition back to community care for continued treatment of their opioid use disorder, while avoiding risk of diversion of medication within the correctional setting. *Affidavit of Donald Kern, MD, MPH, CCHP, para. 8.*

With the exception of withdrawal symptoms which can and will be medicinally managed during periods of incarceration, the only potential deleterious effect of discontinuing medically-assisted treatment is relapse. Because ECSD does not permit opiates in its facility, the only risk of relapse would be from illicitly obtaining those drugs while incarcerated. Once released, Plaintiff will be free to return to return to Methadone if he so chooses. Of course, ECSD's hope— indeed, its addiction treatment purpose—is to prepare the Plaintiff for an opioid-free future by

having him follow the recommended treatment of programming and rehabilitative services.

Tellingly, Plaintiff's argument for Methadone-based MAT does not critique ECSD's non-opioid MAT as being "so inadequate as to constitute an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind" *Leavitt*, 645 F.3d at 497,  but rather 1) promotes  Methadone as the only appropriate standard of care for opioid addiction while ignoring all therapeutic and programmatic treatment and 2) suggests that the sudden cessation of Methadone will result in harm due to withdrawal.  Ergo, says the Plaintiff, ECSD's non-Methadone treatment program violates both the *Eighth Amendment* and the *ADA*.

There is a reason for Plaintiff's lack of criticism of ECSD's addiction treatment program— it is highly successful.   ECSD's addiction treatment program provides inmates individual medical, psychological, emotional, and spiritual care with the opportunity to safely withdraw from opiates and have an opportunity to start living a sober life –without being dependent on addictive medications such as Methadone.   It is based on The Accountability Training Program Model, a modified therapeutic community approach  first implemented at  ECSD by Dr. Stephen K. Valle, Sc.D., MBA, a licensed psychologist and nationally recognized expert in the field of addiction treatment.  *Affidavit of  Stephen Valle.*   It has proved so successful that it served as the foundation for ECSD's state-of-the-art  Detoxification Unit for individuals seeking sentencing diversion.  *Exhibit H.*

 ECSD's non-opioid MAT program has been so successful that it was recently awarded a three-year $1.5M grant from the Department of Health and Human Services Substance Abuse and Mental Health Services Administration to continue with its Vivitrol MAT in the fight against opioid addiction. *Affidavit of William Gerke, Jr.*, *para. 2; see also Exhibit I.*   The grant is a

collaborative initiative undertaken by and between ECSD and Volunteers of America Massachusetts to address the growing need to expand and enhance medication assisted treatment and other recovery supports for incarcerated individuals with an opioid use disorder. *Gerke Affidavit, para. 3.* The hope is that by the third year, 250 new inmates will have been treated, with the main goals of the program to increase the number of inmates with opioid use disorder receiving Vivitrol and other psychological supports and integrated care services in Essex County, as well as decrease illicit opioid use and prescription opioid misuse. *Exhibit I.*

For these reasons alone—namely, that the ECSD program is both safe, successful, and medically recognized as a proper addiction treatment program—Plaintiff's *Eighth Amendment* and *ADA* claims must fail. Per below, however, there are two other reasons why Plaintiff's claims cannot succeed.

First, notwithstanding Plaintiff's hubristic claim that Methadone-based MAT is "the standard of care for opioid use disorder" (Complaint, para. 9), "*there is no constitutional right to Methadone,* and a [correctional facility] is under no obligation to provide it. …'medical detoxification,' . . . does not require the establishment of Methadone maintenance facilities at corrective institutions." *United States ex rel. Walker v. Fayette Cnty., 599 F.2d 573, 575 (3d Cir. 1979)* (citing *Norris v. Frame, 585 F.2d 1183, 1188 (3d Cir. 1978) (emphasis added).* In a similar case involving discontinuance of an inmate's Methadone treatment while in prison, the court in *Gaston v. Patel*, 2013 U.S. Dist. LEXIS 163966, noted:

> Plaintiff has no federal right to his desired treatment,
> drugs and drug dosages. ..Defendants managed
> Plaintiff's pain with prescription medications during
> Methadone detoxification. Plaintiff was not
> subjected to a "cold turkey" detoxification. Nothing

> suggests Defendants' protocol for Methadone
> detoxification
> was medically unacceptable and contrary to … purposes
> and policies.  *Gastel at p. 9.*

Courts have consistently denied liability to sheriffs and correctional officers who fail to

provide Methadone to inmates suffering from withdrawals.  In *Cooley v. Prator*, *290 Fed.Appx.*

*749, 753 (5th Cir. 2008),* an inmate who was addicted to prescription pain medication brought an

*Eighth Amendment* claim against a county sheriff for failing to administer Methadone to treat her

withdrawal symptoms. The court held that an individual who does not receive narcotic pain

medication may foreseeably experience discomfort while incarcerated, but a sheriff failing to

provide for these needs does not rise to indifference or even negligence. *Id.*  Similarly, in *Davis v.*

*Carter*, *452 F.3d 686, 697 (7th Cir.  2006),* the court held that a county jail officer was not

deliberately indifferent to an inmate's Methadone withdrawal symptoms, even though the officer

knew the inmate needed Methadone treatment.   *See also Love v. Thompson 2016 U.S. Dist. LEXIS*

*163343* (Plaintiff's claim that Defendants failure to provide him with a Methadone treatment does

not constitute an *Eighth Amendment* violation and this claim is dismissed with prejudice).

Moreover, the fact that there is a disagreement between Plaintiff and Defendants' treatment

decisions are not alone a basis for a medical indifference claim.  "A difference of opinion between

a prisoner-patient and prison medical authorities, and between medical professionals, regarding

treatment does not give rise to a *[§] 1983* claim," *Franklin v. Oregon, 662 F.2d 1337, 1344 (9th*

*Cir.1981; Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989)* (summary judgment for defendants

was properly granted because plaintiff's evidence that a doctor told him surgery was necessary to

treat his recurring abscesses showed only a difference of opinion as to proper course of care where

prison medical staff treated his recurring abscesses with medicines and hot packs).   Courts must exercise extreme caution when there is a dispute over the type of treatment.   "[W]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims that sound in state tort law." *Graham ex rel. Estate of Graham v. Cnty. of Washtenaw, 358 F.3d 377, 385 (6th Cir. 2004)* (quoting *Westlake v. Lucas, 537 F.2d 857, 860 n.5 (6th Cir. 1976))*."

A similar fatal result awaits Plaintiff's ADA claim.   To state a claim for a violation of Title II, a plaintiff must allege: (1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities or was otherwise  discriminated against; and (3) that such exclusion, denial of benefits or discrimination was by reason of his disability. *Toledo v. Sanchez,* 454 F.3d 24, 31 (1st Cir. 2006).   A disagreement with a reasoned medical judgment is not sufficient to state a disability discrimination claim.   *Kiman v. N.H. Dep't of Corr.,* 451 F.3d 274, 285 (1st Cir. 2006). In this case, the Plaintiff is not arguing that he will be denied medical services. Instead, he is requesting that the court order that he receive specific medication. This is a disagreement with the method of treating a patient at the jail.   Because the Plaintiff is not being excluded from a service or program because of his disability, he has not demonstrated that he is likely to succeed on the ADA claim.

Put simply, the issue before this Court involves a difference of opinion about how to treat Plaintiff's medical condition.   ECSD has made the determination—albeit a different one from the Plaintiff—that its addiction treatment program is both safe, secure and successful, and that opioid replacement medications are not prescribed at the jail because of safety and security

concerns, and because their use runs contrary to the treatment and programming of ECSD's non-opioid MAT program.   "[W]hen a plaintiff's allegations simply reflect a disagreement on the appropriate course of treatment, such a dispute with an exercise of professional judgment may present a colorable claim of negligence, but it falls short of alleging a constitutional violation. The care provided must have been so inadequate as to shock the conscience. *Feeney v. Corr. Med. Servs.*, 464 F.3d 158, 162 (1st Cir. 2006) (citations and quotations omitted).

> 2.    <u>Plaintiff will not suffer irreparable injury in the absence of injunctive relief.</u>

"[T]he burden of demonstrating that a denial of interim injunctive relief would cause irreparable harm [is placed] squarely upon the movant." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 18 (1st Cir. 1996).  This is a substantial burden.  *Id*.  Plaintiff's irreparable harm claim is based on the immediate effects of withdrawal.   As explained below , Plaintiff's "harm" is at best temporary and thus does not rise to the level of an irreparable injury.

This is not a case, as Plaintiff argues, of "immediate and arbitrary withdrawal" of any and all treatment, of Plaintiff going "cold turkey."  Rather, Plaintiff  will receive around-the-clock treatment from a staff of nurses and physicians.   *Kiser Affidavit*.  Plaintiff has provided no evidence whatsoever suggesting Defendants' protocol for Methadone detoxification is medically unacceptable and/or contrary to ECSD purposes and policies, merely his subjective belief that Methadone MAT is best for him and that he may suffer withdrawal symptoms.

The fact that Plaintiff  may suffer opioid withdrawal symptoms also does not rise to an *Eighth Amendment* violation.  See *Ramos v. Patnaude*, 640 F.3d. 485 (1st Cir. 2011) (holding that doctor who treated an inmate's heroin withdrawal with a pharmaceutical protocol which lasted a total of nine days was not deliberately indifferent); *United States v. Walker, 2013 CCA LEXIS 262*

United States Air Force Court of Criminal Appeals March 22, 2013, Decided ACM 37886

("Although the process of detoxifying from Methadone was undoubtedly uncomfortable and

painful, there is no evidence in the record that this process was conducted in a medically

inappropriate manner or that the medical professionals' judgments were unreasonable."); *French v.*

*Daviess County*, *Ky., 376 Fed.Appx. 519, 522 (6th Cir. 2010)* (no deliberate indifference in

weaning prisoner off prescription narcotic using a weaker drug so as to minimize withdrawal

symptoms)*. Baker v. Stevenson,* 605 Fed. Appx. 514, 519-520 (6th Cir. 2015)    ("The facts on

hand indicate that the medical staff sought to gradually wean [Plaintiff] off Methadone rather than

forcing him to go "cold turkey." *Cf. French, 376 F. App'x at 522* (contrasting a gradual

detoxification protocol with an abrupt removal of an addictive drug so as to minimize withdrawal

symptoms).

Plaintiff has not demonstrated that he will suffer irreparable harm if he is not granted

injunctive relief, and thus has not met the burden of proving he is entitled to injunctive relief.

**C.    DEFERENCE MUST BE GIVEN TO THE DEFENDANTS' DISCRETION
TO SET JAIL MEDICAL POLICY**

1.    The balance of equities favors Defendants and the public interest will not be
adversely affected if injunctive relief is denied.

The court "must accord substantial deference to the professional judgment of prison

administrators, who bear a significant responsibility for defining the legitimate goals of a

corrections system and for determining the most appropriate means to accomplish them. . . . The

burden, moreover, is not on the State to prove the validity of prison regulations but on the prisoner to

disprove it." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003).   This is in keeping with the

proposition that "judicial restraint is especially called for in dealing with the complex and intractable

problems of prison administration." *Rogers v. Scurr*, 676 F.2d 1211, 1214 (8th Cir. 1982).  In

the matter of operating jails, the Court gives broad deference to correctional officers, who require

"*substantial discretion* to devise reasonable solutions to the problems they face," including the

detection and deterrence of contraband and weapons in their facilities.  *Florence v. Board of*

*Chosen Freeholders of Burlington*, 132 S.Ct. 1510, 1515; 182 L.Ed.2d 566, 574 (2012) (emphasis

added).  Maintaining security and preserving discipline are essential objectives that may require

the limitation of constitutional rights of detainees, and determining whether a policy is reasonably

related to a legitimate security interest is "peculiarly within the province and professional expertise

of corrections officials." (132 S.Ct. 1517, 182 L.Ed.2d 576, quoting *Bell v. Wolfish* (1979) 441

U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447).  Unless substantial evidence in the record indicates that

officials have exaggerated their response to these challenges, "courts should ordinarily defer to

their expert judgment in such matters." (132 S. Ct. 1517, 182 L.Ed.2d 576, quoting *Block v.*

*Rutherford* (1984) 468 U.S. 576, 104 S. Ct. 3227, 82 L.Ed.2d 38 and *Bell*).

     In Massachusetts, the Legislature has conferred on the sheriff broad authority over a

house of correction.  General Laws c. 126, § 16, states that "[t]he sheriff shall have custody and

control of the jails in his county, and, …, of the houses of correction therein, and of all prisoners

committed thereto . . . and shall be responsible for them."  As the court noted in *Commonwealth*

*v. Donahue,* 452 Mass. 256, 265 (2008), the

    "Legislature has mandated that administrators of county correctional
    facilities establish and maintain education, training, and employment
    programs for persons committed to these facilities. See G. L. c. 127, § 48.
    "Such programs shall include opportunities for academic education,
    vocational education, vocational training, other related prevocational
    programs and employment, and may be made available within correctional
    facilities…

In this case, the Plaintiff seeks the court to issue an order requiring the Defendant to provide the Plaintiff with a specific medication. Doing so would require the Court to override decisions of correctional authorities responsible for the safety, security, and efficient operation of the jail, which would adversely affect the public interest.

ECSD's decision not to provide opioid replacement medication is entitled to deference. "When evaluating medical care and deliberate indifference, security considerations inherent in the functioning of a penological institution must be given significant weight." *Kosilek v. Spencer*, 774 F.3d 63, 83 (1st Cir. 2014). "Prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547, 99 S. Ct. 1861, 1878 (1979). "Such considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." *Pell v. Procunier*, 417 U.S. 817, 827 (1974). "In consequence, even a denial of care may not amount to an Eighth Amendment violation if that decision is based in legitimate concerns regarding prisoner safety and institutional security." *Kosilek*, 774 F.3d at 83.

In sum and substance, the Plaintiff's Complaint is not that he is being denied medical treatment, *but that he is being denied the medical treatment of his and his own doctor's choice*. The Plaintiff cannot demonstrate that the jail policy of employing an alternate means of opioid-addiction treatment—which includes managing the risk of withdrawal symptoms—is an exaggerated response to the security and safety concerns of the jail. Jail administrators are

17

entitled to wide-ranging deference in adopting and enforcing their policies. Courts may not interfere in the exercise of the expert discretion of prison officials in the absence of the required showing.   Given this deferential standard, the Plaintiff has not demonstrated that he is substantially likely to prove that he has been denied adequate medical care as that standard is analyzed under the *Eighth Amendment or ADA*.

### D.      THE MASSACHUSETTS LEGISLATURE HAS ADDRESSED THE ISSUE OF INMATE TREATMENT OF ADDICTION THROUGH PASSAGE OF CHAPTER 208 OF THE ACTS OF 2018

In August 2018, the Massachusetts legislature enacted  "*An Act for Prevention and Access to Appropriate Care and Treatment of Addiction*."[15]  (*Exhibit J*; hereinafter  the "Act").   The Act establishes an opioid  MAT pilot program created by the Department of Public Health in five specific counties across Massachusetts; Essex County is presently not one of them.[16]  Further, the legislature explicitly delegated the sheriffs of these listed counties to implement the pilot program in collaboration with the Executive Office of Public Safety and Security and the Office of Medicaid  (*Id.*, *at Section 98 (a)*).

A county sheriff with jurisdiction over a county correctional facility participating in the pilot program must first develop an implementation plan for the pilot program before any drug is administered.[17]  Such requirements, in relevant part, are listed below:

(i)      best practices for the delivery of medication-assisted treatment and behavioral health counseling for opioid use disorder

---

[15] *MA LEGIS 208 (2018)*.
[16] *MA LEGIS 208 s. 98(a) lists Franklin, Hampden, Hampshire, Middlesex, and Norfolk counties.*
[17] *S. 98(c)*

(ii)    uniform guidelines to ensure the safety and security of correctional facility personnel and people in the custody of the facility during the administration of medication-assisted treatment and behavioral health counseling

(iii)   the projected cost of providing medication-assisted treatment and behavioral health counseling

(iv)    health insurance coverage, including Medicaid

(v)     protocols for technical medical assistance that may be required by the department of public health, including appropriate personnel and physical space to safely administer medication-assisted treatment

(vi)    the availability of appropriate community services after release, including a process for directly connecting a person upon release to an appropriate provider or treatment site in the geographic region in which the person will reside upon release in order to continue treatment

(vii)   appropriate metrics for evaluating and tracking pilot program outcomes; and

(viii)  any other information necessary to implement the pilot program

*MA LEGIS 208 (2018), 2018 Mass. Legis. Serv. Ch. 208 (H.B. 4742) (WEST).*

At this juncture, there are no "best practices," nor "uniform guidelines," nor "protocols," nor "appropriate metrics" in place—much less a "projected cost of providing medication-assisted treatment and behavioral health counseling…"  Granting the Plaintiff's request to receive Methadone treatment *now,* without the infrastructure required by the Act in place, places an undue burden on ECSD and jeopardized the safety and security of the entire jail facility.

Further, the Act specifies that the pilot program shall be implemented "*not later than September 1, 2019*" (*Id., at section 98 (d)*).  Plaintiff, if he pleads or is found guilty, would do so at his next hearing on December 3, 2018.  His likely 60-day sentence would begin shortly after.  No county in Massachusetts—especially one like Essex County that is not yet participating in the pilot program—is required under the Act to implement before September of next year.  Plaintiff would be released long before the required implementation date, and so he should not be entitled to advanced Methadone treatment for a program that has not already begun.

# V.     CONCLUSION

For all of the foregoing reasons, Plaintiff's Motion for a Temporary Restraining Order and

Preliminary and Permanent Injunction Relief should be denied.

Respectfully submitted
DEFENDANTS,
By their attorney,

_/s/ Stephen C. Pfaff_____
Stephen C. Pfaff (BBO# 553057)
Louison, Costello, Condon & Pfaff, LLP
101 Summer Street, 4th Floor
Boston, MA 02110
(617) 439-0305  _spfaff@lccplaw.com_

Date: October 19, 2018

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this day I caused a true copy of the above document to be served upon the attorney of record for all parties via CM/ECF

Robert Frederickson III (BBO 670111)
Michael Pickett (BBO 698618)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, Massachusetts 02210
Tel.: 617.570.1000
Fax.: 617.523.1231
RFrederickson@goodwinlaw.com
MPickett@goodwinlaw.com

Ira Levy *(Pro hac vice* pending)
Alexandra Valenti *(Pro hac vice* pending)
Jenny Zhang (BBO 689838)
GOODWIN PROCTER LLP
The New York Times Building
620 Eight Avenue
New York, NY 10018

Date: October 19, 2018

___*/s/Stephen C. Pfaff*_____
Stephen C. Pfaff