|  |  |  |
|---|---|---|
| **GEOFFREY PESCE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Civil Action No. 18-11972-DJC** |
| | ) | |
| **KEVIN F. COPPINGER, in his official** | ) | |
| **capacity as Essex County Sheriff,** | ) | |
| **AARON EASTMAN, in his official** | ) | |
| **capacity as Superintendent of the Essex** | ) | |
| **County House of Corrections – Middleton,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

<u>**MEMORANDUM AND ORDER**</u>

**CASPER, J.**                                                **November 26, 2018**

**I.      Introduction**

Plaintiff Geoffrey Pesce ("Pesce") is a resident of Ipswich, Massachusetts who has been in active recovery from opioid addiction for two years with the help of a methadone treatment program prescribed by his doctor.  D. 15.  Pesce brings this lawsuit against Defendant Kevin F. Coppinger ("Coppinger"), in his official capacity as Sherriff of Essex County, and Aaron Eastman ("Eastman"), in his official capacity as Superintendent of the Essex County House of Corrections at Middleton, Massachusetts ("Middleton"), (collectively, "Defendants"), alleging that Defendants' policy of denying inmates access to methadone for the treatment of opioid use disorder violates the Americans with Disabilities Act ("ADA") and the Eighth Amendment pursuant to 42 U.S.C. § 1983.  D. 1.  Due to imminent probation and criminal matters pending against him in Essex County, including a statutory mandatory minimum sentence of sixty days,

Pesce will be incarcerated at Middleton as early as December 3, 2018. Pesce seeks injunctive relief requiring that Defendants provide Pesce with access to his physician-prescribed methadone treatment. D. 12. For the reasons discussed below, Pesce's motion for preliminary injunction is ALLOWED.

## II.      Standard of Review

The Court recognizes that preliminary injunctive relief "is an 'extraordinary and drastic remedy.'" Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc., 645 F.3d 26, 32 (1st Cir. 2011) (quoting Munaf v. Geren, 553 U.S. 674, 689-90 (2008)). To obtain such relief, the Court must consider: (1) the movant's likelihood of success on the merits; (2) the likelihood of the movant suffering irreparable harm; (3) the balance of equities; and (4) whether granting the injunction is in the public interest. Corp. Techs., Inc. v. Harnett, 731 F.3d 6, 9 (1st Cir. 2013). Likelihood of success on the merits is the "main bearing wall of this framework." W Holding Co. v. AIG Ins. Co.-Puerto Rico, 748 F.3d 377, 383 (1st Cir. 2014) (quoting Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 16 (1st Cir. 1996)) (internal quotation marks omitted). Irreparable harm, on the other hand, is measured "on a sliding scale, working in conjunction with a moving party's likelihood of success on the merits, such that the strength of the showing necessary on irreparable harm depends in part on the degree of likelihood of success shown." Gedeon v. City of Springfield, No. 16-CV-30054-MGM, 2017 WL 4212334, at *8 (D. Mass. Feb. 24, 2017) (quoting Braintree Labs., Inc. v. Citigroup Global Mkts., Inc., 622 F.3d 36, 42-43 (1st Cir. 2010)). The plaintiff "bears the burden of establishing that these four factors weigh in [his] favor." Esso Standard Oil Co. (P.R.) v. Monroig-Zayas, 445 F.3d 13, 18 (1st Cir. 2006).

## III. Factual Background

Unless otherwise noted, the following facts are drawn from the complaint, D. 1, Pesce's motion for injunctive relief, D. 12, Defendants' opposition, D. 41, and the parties' supporting filings. [1]

### A. <u>Diagnosis and Treatment of Pesce's Opioid Use Disorder</u>

Pesce is a thirty-two year old man who has struggled with addiction for several years. D. 13 at 10-11; D. 15 ¶¶ 1, 7, 9. Specifically, he suffers from a chronic disease known as opioid use disorder. D. 1 ¶ 3; D. 18 ¶¶ 11, 20. This disease claims the lives of over one hundred Americans every day. <u>See</u> Centers for Disease Control and Prevention, Opioid Overdose: Understanding the Epidemic, *https://www.cdc.gov/drugoverdose/epidemic* (last visited Nov. 20, 2018) (explaining that "[o]n average, 115 Americans die every day from an opioid overdose"). More than half a million people in the United States have died from opioid overdose in the last twenty years and the death toll has rapidly increased in the last five years. D. 1 ¶ 22. Here in Massachusetts, opioid-related deaths have surpassed the national average and increased exponentially in the last two years. <u>See</u> <u>id.</u> (citing Massachusetts Department of Public Health, The Massachusetts Opioid Epidemic, A Data Visualization of Findings from the Chapter 55 Report, *http://www.mass.gov/chapter55* (last visited Nov. 20, 2018)). Essex County, where Pesce resides, has had the second highest number of opioid-related deaths of any county in Massachusetts since 2013. D. 13 at 9; D. 14-1. In addition, the opioid-related death rate in Massachusetts is 120 times

---

[1] The Court has allowed motions filed by Public Health Scholars and Massachusetts Medical Society *et al.* for leave to file amici curiae briefs in support of Pesce's motion for injunctive relief. D. 47; D. 53. Accordingly, the Court considered those reply briefs, D. 47-2; D. 53, in connection with the resolution of Pesce's motion for injunctive relief.

higher for people released from jails and prisons as compared to the rest of the adult population. D. 17-8 at 51.

As with other chronic diseases, opioid use disorder involves cycles of relapse and remission. D. 1 ¶ 21. Without treatment or other recovery, opioid use disorder may result in disability or premature death. Id. Before entering active recovery, Pesce's battle with opioid use disorder caused him to lose his job, forced him to surrender custody of his son and rendered him effectively homeless. D. 15 ¶¶ 7-10. Pesce overdosed on opioids at least six times, and, on multiple occasions, paramedics administered Narcan to save his life. Id. ¶ 11. Pesce made numerous attempts to overcome his opioid addiction, including by enrolling in at least four detoxification programs and by taking medications such as buprenorphine (commonly known by the brand name Suboxone®) and naltrexone (commonly known by the brand name Vivitrol®). Id. ¶ 12; D. 19 ¶ 6. None of these efforts were successful at helping Pesce maintain long-term recovery. D. 15 ¶ 12.

Pesce was admitted into a treatment program for substance abuse at the Lahey Behavioral Services facility ("Lahey") in Danvers, Massachusetts in December 2016. D. 19 ¶ 10. Pesce's physician there, Dr. Shorta Yuasa ("Dr. Yuasa"),[2] prescribed medication-assisted treatment ("MAT") with methadone to treat Pesce's disorder. Id. ¶¶ 6, 10. According to Dr. Yuasa, MAT is the "standard of care for treatment of opioid use disorders." Id. ¶ 7. MAT involves the use of FDA-approved pharmaceutical medications, including methadone, buprenorphine and naltrexone, in combination with counseling, behavioral therapy and other interventions for the treatment of

_____

[2] Dr. Yuasa is a board-certified physician in emergency medicine and addiction medicine. D. 19 ¶ 1. Dr. Yuasa administered Pesce's methadone treatment between 2016 and, at least, September 2018. Id. ¶¶ 1, 27. Although Dr. Yuasa recently left Lahey, Pesce's diagnosis and treatment program have remained the same under his new treating physician, Dr. Barry Ginsberg. D. 45 ¶ 4.

substance use disorders.  Id.  As part of his decision to prescribe methadone, Dr. Yuasa considered, among other things, the length and severity of Pesce's addiction to opioids and his previously unsuccessful attempts to achieve long-term recovery using buprenorphine and naltrexone.  Id. ¶ 10.  In Dr. Yuasa's experience, "there are some people for whom buprenorphine and naltrexone simply do not work, and [Pesce's] history suggests that he is one of those people."  Id.

Since late 2016, Pesce has received a daily dosage of methadone in liquid form at Lahey. D. 19 ¶¶ 13, 15-16; see D. 44 ¶ 8 (explaining that methadone is a liquid that is administered orally). With this methadone treatment, Pesce has been in active recovery from opioid use disorder for almost two years.  D. 19 ¶¶ 13-14; D. 15 ¶¶ 14-22.  During this time, Pesce has not had a positive drug screening and he has not intentionally missed a day of treatment.  D. 19 ¶ 13.  He is working again as a machinist, contributes financially to his family and is able to spend time with his son. D. 15 ¶¶ 18-19.  Pesce is now able to take home and self-administer a three-day dosage of methadone. D. 19 ¶ 14.  Nevertheless, Dr. Yuasa opines that Pesce must continue to use methadone as part of his ongoing recovery as he is not ready to be tapered off his medication.  Id. ¶ 17. According to Dr. Yuasa, without methadone treatment, Pesce will no longer be in remission from active addiction and his tolerance for opioids will diminish significantly.  Id. ¶ 24.  Dr. Yuasa has treated numerous patients who have relapsed, overdosed and died after being denied access to MAT during incarceration.  Id.

**B.    Pesce's Current Criminal Matters**

Pesce has two criminal matters pending in Essex County.  In March 2016, prior to his recovery, Pesce was charged with operating a motor vehicle under the influence of drugs.  D. 26; D. 26-2 ¶ 3.  Pesce entered a guilty plea in September 2017 and received a sixty-day sentence that was suspended under the condition that he successfully complete probation, set to expire in

September 2019.  D. 26-2 ¶ 3; D. 26-1 ¶ 2.  In July 2018, while still on probation, Pesce was pulled over on the way to Lahey and charged with driving with a revoked or suspended license.  D. 26-1 ¶¶ 3-4.  The criminal charge for driving with a revoked or suspended license constituted a violation of the terms of Pesce's probation.  D. 26-2 ¶ 5.

Pesce must now appear in Lynn District Court for a probation violation hearing on December 3, 2018.  D. 31.  At that hearing, as a sanction for violation of the terms of his probation, the court could impose the sentence of sixty days previously imposed, but suspended.  D. 26-2 ¶ 5.  On January 14, 2019, Pesce must appear in Ipswich District Court for entry of a guilty plea and sentencing for driving with a revoked or suspended license in July 2018.  D. 31 at 1.  That charge carries a mandatory minimum sentence of sixty days pursuant to Mass. Gen. L. c. 90, § 23.  See D. 26-1 ¶ 4.  The parties agree he would serve any sentence imposed upon him at either hearing at Middleton.  See D. 26 at 4; D. 13 at 12-13: D. 41 at 2.

Because Middleton does not currently provide methadone treatment to its inmates, Pesce attempted to taper down his methadone prescription in anticipation of going through forced withdrawal upon incarceration.  D. 19 ¶ 16.  When Pesce reduced his methadone dosage from 120 mg per day to 20 mg per day, he became sick, suffered from insomnia and felt anxious, unmotivated, fatigued and depressed.  Id.  According to Dr. Yuasa, Pesce's reaction to a reduced dosage indicates that he should be taking between 80 and 100 mg of methadone a day to treat his opioid use disorder properly.  Id.  Dr. Yuasa opines that sudden, involuntary withdrawal of treatment will cause Pesce "severe and needless suffering, jeopardize[s] his long-term recovery and is inconsistent with sound medical practice."  Id. ¶ 20.  Dr. Yuasa believes that denying Pesce "medically necessary" methadone treatment will place him at a high risk of overdose and death upon his release from Middleton.  Id. ¶ 27; see id. ¶ 24; see also D. 17 ¶¶ 19, 21-22 (explaining

that disruption of MAT has "long-term consequences for inmates during and after their incarceration," including inability to successfully resume methadone treatment after release, loss of opioid tolerance and risk of fatal overdose upon re-exposure to even small amounts of certain drugs, especially in the first thirty days after returning to society).

Pesce's counsel sent a letter, dated September 11, 2018, to Defendants, who are responsible for the housing and care of Middleton's incarcerated population, D. 1 ¶¶ 15-16, requesting assurance that Pesce will be allowed to continue methadone treatment during his time in custody. D. 13 at 14; D. 14-2. The letter requested a response by September 17, 2018, but the Court understands that Defendants had not responded to the letter as of Pesce's filings a few days later. Id.

### C. Treatment of Opioid Use Disorder in Essex County House of Corrections

To create an environment where individuals can "safely" withdraw from opioid addiction, Middleton is committed to maintaining a drug-free environment. D. 41-15 ¶ 12. Consistent with the majority of correctional facilities in Massachusetts, Middleton expressly prohibits opioids like suboxone and methadone.[3] Id. ¶ 13. As part of its substance abuse treatment program, Middleton requires incarcerated individuals to undergo forced withdrawal under medical supervision, followed by a treatment plan that includes substance abuse therapy, educational programming, re-entry services and after-care treatment upon release to the community. Id. ¶ 6. During the forced withdrawal process, individuals may receive non-opioid medication to mitigate their symptoms. D. 41-13 ¶ 6 (explaining that individuals may receive "Ibuprofen for pain, Bentyl for stomach

---

[3] The Court understands that two detention facilities in Massachusetts offer methadone and/or buprenorphine to inmates. D. 17 ¶ 17. The Franklin County House of Corrections administers buprenorphine to inmates with opioid use disorder, and the Massachusetts Correctional Institution at Framingham provides access to methadone for pregnant women to avoid medical risks associated with withdrawal. Id.

cramps, Imodium for diarrhea, Zofran for nausea, Maalox for indigestion and Clonidine for anxiety and/or elevated blood pressure"). In some cases, Middleton administers Vivitrol® at the end of a term of incarceration on the eve of release. D. 41-15 ¶ 6; 41-13 ¶ 10 (describing Vivitrol® as a "non-opioid medication aimed at preventing substance abuse relapse"). The non-opioid treatment program implemented in Essex County correctional facilities, including Middleton, was recently awarded a three-year, $1.5 million grant from the Department of Health and Human Services Substance Abuse and Mental Health Services Administration. D. 41 at 10.

## IV.    Procedural History

On September 19, 2018, Pesce instituted this lawsuit, D. 1, and filed a motion seeking a preliminary injunction and a temporary restraining order. D. 12. The next day, Pesce filed an emergency motion for an expedited briefing schedule and hearing. D. 20. As support for the motion, Pesce asserted that he was scheduled to appear in a pending criminal case on September 24, 2018. Id. at 1. The motion was denied given the Court's interest in giving full consideration to the arguments by both sides and in the absence of an explanation of why Pesce could not seek a continuance of his criminal matter. D. 25. Shortly thereafter, Pesce informed the Court that his new criminal case was continued to January 14, 2019 and that he was scheduled to appear for a probation revocation hearing on December 3, 2018. D. 31. On November 5, 2018, the Court heard the parties on Pesce's motion for injunctive relief and took the matter under advisement. D. 49.

## V.    Discussion

### A.    Pesce's Claims are Ripe

Pesce seeks injunctive relief requiring that Defendants provide him with access to methadone treatment while he is incarcerated. Defendants contend that Pesce's claims are not ripe for adjudication since there is "uncertainty" about what sentence Pesce will receive during his probation revocation hearing on December 3, 2018 and in the matter scheduled for his plea and

sentencing on January 14, 2019.  D. 41 at 4.  The ripeness doctrine "asks whether an injury that has not yet happened is sufficiently likely to happen to warrant judicial review."  Gun Owners' Action League, Inc. v. Swift, 284 F.3d 198, 205 (1st Cir. 2002) (citation and internal quotation marks omitted).  A claim is ripe "only if . . . the issues raised are fit for judicial decision at the time the suit is filed and . . . the party bringing suit will suffer hardship if court consideration is withheld."  Labor Relations Div. of Constr. Indus. of Mass., Inc. v. Healey, 844 F.3d 318, 326 (1st Cir. 2016) (citation and internal quotation marks omitted).  In conducting the fitness inquiry, the Court considers "whether the claim involves uncertain and contingent events that may not occur as anticipated or may not occur at all."  Ernst & Young v. Depositors Econ. Prot. Corp., 45 F.3d 530, 536 (1st Cir. 1995) (quoting Mass. Ass'n of Afro-Am. Police, Inc. v. Boston Police Dep't, 973 F.2d 18, 20 (1st Cir. 1992)) (internal quotation marks omitted).  The hardship inquiry centers upon "the hardship that may be entailed in denying judicial review," id., and "whether the sought-after declaration would be of practical assistance in setting the underlying controversy to rest."  Town of Barnstable v. O'Connor, 786 F.3d 130, 143 (1st Cir. 2015) (quoting Verizon New England, Inc. v. Int'l Bhd. of Elec. Workers, Local No. 2322, 651 F.3d 176, 188 (1st Cir. 2011)).  Although "plaintiff must present evidence sufficient to satisfy both prongs of the test[,] . . . a very strong showing on one axis may compensate for a relatively weak showing on the other."  NEGB, LLC v. Weinstein Co. Holdings, LLC, 490 F. Supp. 2d 89, 95 (D. Mass. 2007) (citations and internal quotation marks omitted).

Defendants assert that Pesce's claims are premature because there is some uncertainty concerning the imminence of his incarceration.  D. 41 at 4.  Pesce has two pending criminal matters in Essex County.  On December 3, 2018, Pesce must appear in Lynn District Court for a probation violation hearing.  D. 31.  If the court determines by a preponderance of the evidence that Pesce's

new criminal offense constitutes a violation of his probation, Pesce could be ordered to serve his previously suspended sixty-day sentence. D. 26-2 ¶¶ 3-9 (explaining that the district court need only find by a preponderance of the evidence that Pesce is guilty of violating his probation to revoke the same and order him to serve the suspended sentence of sixty days, which would start immediately). In addition, on January 14, 2019, Pesce must appear in Ipswich District Court for entry of a guilty plea and sentencing for driving with a revoked or suspended license in July 2018. D. 31. Pesce attests that he will plead guilty to this offense, D. 15 ¶ 26, which carries a mandatory minimum penalty of not less than sixty days and not more than two and a half years, D. 26-1 ¶ 4.

The Court is, therefore, satisfied that Pesce's impending incarceration renders this case ripe for judicial review. Pesce faces a sixty-day sentence for violation of his probation which was previously imposed but suspended, see, e.g., D. 26-2 ¶ 5, and a sixty-day mandatory minimum sentence for driving with a suspended or revoked license due to operating under the influence of alcohol or drugs, see Mass. Gen. L. c. 90, § 23 (explaining that the sixty-day sentence of imprisonment "shall not be reduced to less than sixty days, nor suspended, nor shall any such person be eligible for probation, parole, or furlough or receive any deduction from his sentence for good conduct until he shall have served sixty days of such sentence"). Regardless of any continuances he may receive, Pesce will join Middleton's incarcerated population given the pending mandatory minimum sentence and, on his first day there, he will be denied the methadone treatment he has received on a near-daily basis since late 2016. D. 41 at 5 (explaining that Middleton does not provide opioid treatment to inmates). The ripeness doctrine does not require plaintiffs to "await the consummation of threatened injury to obtain preventive relief" where, as here "the injury is certainly impending." Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979) (quoting Pennsylvania v. West Virginia, 262 U.S. 553, 593 (1923)) (internal

quotation marks omitted). The Court is also satisfied that the "challenged action creates a 'direct and immediate' dilemma for the parties." W.R. Grace & Co.-Conn. v. U.S. EPA, 959 F.2d 360, 364 (1st Cir. 1992) (citations omitted). According to counsel's representations during the hearing, Pesce will be transported to Middleton soon after he is sentenced. D. 51 at 10:1-7. When he arrives, Pesce will be subjected to that which he requests relief from: forced withdrawal and denial of methadone treatment. D. 41 at 5 (explaining that Defendants have determined the "best course of treatment for heroin or other opioid addiction is to provide non-opioid treatment and programmatic services"). The potential hardship at issue weighs heavily in favor of prompt adjudication, whereas the benefits of delay are minimal at best.

The prudential considerations germane to the ripeness analysis also support judicial review. See NEGB, 490 F. Supp. 2d at 95 (quoting Mangual v. Rotger–Sabat, 317 F.3d 45, 59 (1st Cir. 2003)) (explaining that "[w]hile the [ripeness] doctrine is a product of the Article III case or controversy requirement, it is also grounded in 'prudential considerations'"). Where, as here, the record is sufficiently developed and the disagreement between the parties is definite, the dispute is ripe for judicial consideration. Cf. NEGB, 490 F. Supp. 2d at 95 (citing Riva v. Commonwealth of Mass., 61 F.3d 1003, 1009-10 (1st Cir. 1995)) (considering whether the parties' controversy was too "abstract" and whether the case was "fully developed" in concluding that "the absence of a concrete factual situation seriously inhibit[ed]" adjudication). Permitting this action to proceed would not require the Court to expend judicial resources by engaging in "shadow boxing." Id. at 96 (quoting Ernst & Young, 45 F.3d at 537) (concluding that a case alleging, among other claims, tortious interference with business relations and negligent misrepresentation was not ripe where certain key facts, including the content of the advertisement at issue and whether the defendants intended to publish it, were not concrete and could still alter the nature of the dispute between the

parties). There is no uncertainty with respect to the facts and issues relevant to resolving this dispute. Pesce has a prescription for methadone, his physician recommends continued treatment and Defendants will not provide Pesce access to this medication during his incarceration at Middleton. Neither the issues presented nor the relief sought depend upon the timing of Pesce's incarceration. In its present condition, the record before the Court (including the declarations on both sides, research, scientific journals, the medical opinion of Pesce's physician and Defendant Eastman's description of Middleton's policy and treatment program) allows for a "fair, focused, and intelligent analysis of the issues presented." Id. (quoting W.R. Grace, 959 F.2d at 365) (internal quotation marks omitted). The Court, therefore, concludes that the matter is ripe for review.

### B. Likelihood of Success on the Merits

The Court next considers the "sine qua non" of the four-part inquiry for injunctive relief: likelihood of success on the merits. New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002). If Pesce cannot demonstrate that he is likely to succeed on the merits of his ADA and Eighth Amendment Claims, the remaining factors relevant to relief become matters of "idle curiosity." Id.; see Boathouse Grp., Inc. v. TigerLogic Corp., 777 F. Supp. 2d 243, 248 (D. Mass. 2011) (quoting EEOC v. Astra U.S.A., Inc., 94 F.3d 738, 743 (1st Cir. 1996)) (explaining that "[l]ikelihood of success on the merits is the critical factor in the analysis and, accordingly, a strong likelihood of success may overcome a 'somewhat less' showing of another element"). The Court will consider each claim in turn.

#### 1. ADA Claim

Pesce alleges that Defendants' policy of denying methadone treatment to Middleton's incarcerated population violates his rights under the ADA. Pesce relies upon Title II of the ADA, which states that "no qualified individual with a disability shall, by reason of such disability, be

excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132 (2006). To prove a violation of Title II, a plaintiff must show that he: (1) "is a qualified individual with a disability;" (2) "was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities or was otherwise discriminated against;" and (3) "that such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability." Parker v. Universidad de P.R., 225 F.3d 1, 5 (1st Cir. 2000).

The parties do not dispute that Pesce, who suffers from opioid use disorder, is a "qualified individual[] with disabilities" under the ADA. D. 13 at 15; D. 41 at 13. Here, Pesce asserts that Defendants' refusal to administer methadone (as prescribed) deprives him of the benefit of health care programs, and that such conduct constitutes discrimination on the basis of his disability. D. 13 at 22-23. As an initial matter, the medical care provided to Middleton's incarcerated population qualifies as a "service" that disabled inmates must receive indiscriminately under the ADA. Penn. Dep't of Corr. v. Yeskey, 524 U.S. 206, 210 (1998). Pesce asserts that he should have access to methadone because it is the only medication that has been effective in treating his disorder. D. 15 ¶ 17. Pesce's physician, Dr. Yuasa, strongly recommends that he continue methadone treatment while incarcerated. D. 19 ¶¶ 18-27. Dr. Yuasa also explained that Pesce risks severe physical and mental illness, relapse into opioid addiction and death if he is denied access to methadone and subjected to Defendants' treatment program. Id. ¶¶ 20-27. Defendants, in lieu of conducting an individualized assessment of Pesce's medical needs or his physician's recommendation, would require Pesce to participate in a treatment program that bares strong resemblance to the methods that failed Pesce for five years, including detoxification, D. 13 at 11 (describing Pesce's four unsuccessful attempts at detoxification programs), and administration of Vivitrol®, D. 15 ¶ 12

(explaining that the same is ineffective as it pertains to Pesce). Not only would Defendants' treatment program contradict Pesce's physician's recommendations and place Pesce at a higher risk of relapse upon his release from Middleton, but it would also make him physically ill for several days while he undergoes forced withdrawal. D. 19 ¶¶ 21-22.

Defendants rely on Kiman v. N.H. Dep't of Corr., 451 F.3d 274 (1st Cir. 2006) for the proposition that a "disagreement with reasoned medical judgment is not sufficient to state a disability discrimination claim." D. 41 at 13 (citing Kiman, 451 F.3d at 285). That case is readily distinguishable on this record. The record in Kiman indicates that "prison medical staff sought [the plaintiff's] medical records" and "arranged an outside specialist consultation" before determining a course of treatment. Kiman, 451 F.3d at 285. Defendants here have not given any consideration to Pesce's specific medical needs nor indicated any likelihood to do so when he is incarcerated given their present policy against methadone treatment. See D. 41 at 5. Medical decisions that rest on stereotypes about the disabled rather than "an individualized inquiry into the patient's condition" may be considered discriminatory. Kiman, 451 F.3d at 285 (quoting Lesley v. Chie, 250 F.3d 47, 55 (1st Cir. 2001)).

Defendants have identified legitimate, but generalized, safety and security reasons for prohibiting the use of opioids in their facilities. See Kogut v. Ashe, 602 F. Supp. 2d 251, 253 (D. Mass. 2009) (explaining that "concerns over prison security may be legitimate non-discriminatory grounds for limiting access to a jail program"); see also D. 41 at 8; D. 41-15 ¶¶ 14-15 (detailing dangerous conditions associated with illicit substances Essex County's correctional facilities). The Court recognizes that Defendants' primary objective is to enforce policies that promote public safety. D. 41-15 ¶¶ 3-5. Defendants, however, have not articulated specific security concerns relevant to Pesce's proposed methadone intake. Cf. Kogut, 602 F. Supp. 3d at 253 (explaining

that the denial of petitioner's access to a program was not a violation of the ADA given petitioner's record of violence in jail).  For example, Defendants have not explained why they cannot safely and securely administer prescription methadone in liquid form to Pesce under the supervision of medical staff, especially given that this is a common practice in institutions across the United States and in two facilities in Massachusetts.  See D. 44 ¶ 8 (explaining that protocol for oral administration of methadone includes ensuring that the inmate has fully ingested the dose by having the inmate drink a glass of water and then speak to the nurse); D. 43 ¶ 10.  Without more, Defendants' concerns about inmates "cheeking" medications, *i.e.*, hoarding legally prescribed and administered medicine for use or transfer to other inmates, see D. 41 at 8, are not applicable to Pesce or the liquid methadone prescription at issue here.

Defendants are correct to point out that their addiction treatment program has been well regarded in many respects.  D. 41 at 10-11 (noting that Defendants received a $1.5 million grant from the Department of Health and Human Services Substance Abuse and Mental Health Services Administration to continue, among other things, providing Vivitrol® to inmates shortly before their release).  Where there is a dispute over the "adequacy of the treatment," federal courts are "reluctant to second guess medical judgments."  Graham ex rel. Estate of Graham v. Cnty. Of Washtenaw, 358 F.3d 377, 385 (6th Cir. 2004) (quoting Westlake v. Lucas, 537 F.2d 857, 860 (6th Cir. 1976)).  Here, Defendants' proposed treatment program involves strategies that have been documented on this record as ineffective at treating Pesce's disorder and that could potentially place Pesce at a higher risk of relapse and overdose upon release, see D. 53 at 13 (explaining that "non-MAT withdrawal programs may increase the likelihood of overdose death" by eliminating tolerance for opioids).  Absent medical or individualized security considerations underlying the decision to deny access to medically necessary treatment, Defendants' policy as applied to Pesce

is either "arbitrary or capricious-as to imply that it was pretext for some discriminatory motive" or "discriminatory on its face." Kiman, 451 F.3d at 284.[4] On the present record, Pesce is, therefore, likely to succeed on the merits of his ADA claim against Defendants.

## 2. Eighth Amendment Claim

Pesce also argues that Defendants' refusal to provide access to methadone constitutes cruel and unusual punishment in violation of the Eighth Amendment. To prevail on an Eighth Amendment claim of deliberate indifference based on inadequate or delayed medical care, the plaintiff must satisfy both an objective and subjective inquiry. See, e.g., Perry v. Roy, 782 F.3d 73, 78 (1st Cir. 2015). The objective prong requires the plaintiff establish that his medical need is or was "sufficiently serious," Burrell v. Hampshire Cty., 307 F.3d 1, 8 (1st Cir. 2002), meaning it was either diagnosed by a physician as mandating treatment or is so obvious that a layperson would recognize the need for medical assistance, see Gaudreault v. Mun. of Salem, Mass., 923 F.2d 203, 208 (1st Cir. 1990). To prevail on the subjective prong, the plaintiff must show that the defendants acted with intent or wanton disregard when providing inadequate care. See Perry, 782 F.3d at 79. For the reasons previously discussed, Pesce is reasonably likely to satisfy the objective inquiry where the treatment he would be denied has been documented as the only adequate treatment for his opioid use disorder. Accordingly, the Court turns to the subjective prong of the analysis.

Pesce contends that Defendants' refusal to continue his prescribed methadone treatment constitutes deliberate indifference to his medical condition. Defendants have implemented a blanket policy prohibiting the use of methadone treatment at Middleton. They have stood by the policy without any indication that they would consider Pesce's particular medical history and

---

[4] Because the Court concludes Pesce has demonstrated likelihood of success on the merits of his ADA claim for the reasons discussed herein, it does not reach Pesce's argument that Defendants failed to reasonably accommodate his disability.

prescribed treatment in considering whether departure from such policy might be warranted. The cases that Defendants cite for support are inapposite as they involve decisions to deny treatment based on individualized assessments of inmates' medical needs. See Corley v. Prator, 290 Fed. Appx. 749, 752-53 (2008) (concluding there was no Eighth Amendment violation where medical staff prescribed over-the-counter medications after examining the plaintiff and where plaintiff did not request methadone or mention that she was experiencing withdrawal); Gaston v. Patel, No. 1:09-CV-01966-AWI-MJS (PC), 2013 WL 6070053, at *3 (E.D. Cal. Nov. 18, 2013) (explaining that nothing on the record suggested Defendants' protocol for methadone detoxification was "medically unacceptable" for the plaintiff). Defendants also note that courts in other districts have held that prison officials did not violate the Eighth Amendment where the medical treatment provided differed from what the plaintiff (as opposed to a physician or other medical professional) requested. See Love v. Thompson, No. 2:15-CV-01712-CRE, 2016 WL 6991202, at *1-5 (W.D. Pa. Nov. 28, 2016) (concluding there was no Eighth Amendment violation where prison official refused to provide methadone treatment despite plaintiff's unsupported assertion that he had a prescription). Here, however, Pesce alleges that Defendants' course of treatment ignores and contradicts his physician's recommendations. In the First Circuit, "[a]llegations that prison officials denied or delayed recommended treatment by medical professionals may be sufficient to satisfy the deliberate indifference standard." Alexander v. Weiner, 841 F. Supp. 2d 486, 493 (D. Mass. 2012) (citations and internal quotation marks omitted).

Defendants' current policy ensures Pesce will be denied methadone treatment despite his physician's recommendations and contrary to the opinions of health care professionals familiar with Pesce's history of unsuccessful attempts at recovery prior to being treated with methadone. See, e.g., D. 47-2 at 11 (explaining that Defendants' policy will place Pesce at great risk because,

among other reasons, Vivitrol® and methadone are not interchangeable treatments for opioid use disorder).  Because Pesce has alleged that Defendants' policy "ignore[s] treatment prescriptions given to Plaintiff by [his] doctors," the Court concludes that, on the present record, Pesce is likely to succeed on the merits of his Eighth Amendment claim.  <u>Alexander</u>, 841 F. Supp. at 493 (holding that plaintiff, who alleged that prison officials repeatedly ignored her physician's recommendations, stated sufficient facts to establish an Eighth Amendment violation).

### C.      <u>Irreparable Harm</u>

To obtain injunctive relief, Pesce must also show a "significant risk of irreparable harm if the injunction is withheld."  <u>Nieves-Márquez v. P.R.</u>, 353 F.3d 108, 120 (1st Cir. 2003).  Pesce will be irreparably harmed if denied methadone treatment while incarcerated.  D. 15 ¶¶ 11-16 (describing Pesce's unsuccessful attempts at sobriety, including through the use of detoxification programs, living in half-way houses, and attending group and individual therapy).  After overdosing three times in less than twenty-four hours, Pesce enrolled in the methadone treatment program that helped him reclaim his life.  <u>Id.</u> ¶ 14.  According to the physician who first diagnosed and treated his condition, Pesce presents a "high risk of overdose and death upon his release" if not treated during his incarceration at Middleton.  D. 19 ¶ 24.  Indeed, "[o]ver 82% of patients who leave methadone treatment relapse to intravenous drug use within a year," and "[d]eath is three times as likely for people out of treatment versus when in treatment."  D. 18 ¶ 36.  Unfortunately, the statistics become even more alarming when considering incarcerated and formerly incarcerated individuals.  D. 17 ¶ 22 (explaining that the "opioid-related overdose death rate is 120 times higher for people released from jails and prisons compared to the rest of the adult population"); <u>id.</u> (noting that "nearly 50 percent of all deaths among those released from incarceration were opioid-related"

and the "vast majority of these deaths occurred within one month after release"). Pesce, therefore, has established a reasonable likelihood of irreparable harm if denied injunctive relief.

### D.    The Balance of Harms and the Public Interest

The final considerations in weighing the grant of a preliminary injunction are "a balance of equities in the plaintiff's favor, and [] service of the public interest." Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, 794 F. 3d 168, 171 (1st Cir. 2015). The Court acknowledges that prison officials must prioritize legitimate security concerns in determining whether to introduce opioids to incarcerated populations. The Court also accords substantial deference to the professional judgment of prison administrators. Overton v. Bazzetta, 539 U.S. 126, 132 (2003). With respect to this plaintiff and based on this particular record, however, the Court concludes that the balance of harms between the parties tips in Pesce's favor and the public interest is better served by ensuring Pesce receives the medically necessary treatment that will ensure he remains in active recovery. That Pesce has established a substantial likelihood of success on the merits tips the balance of interests in his favor.

### VI.    Conclusion

For these reasons, Pesce's motion for preliminary injunction, D. 12, is ALLOWED. The parties did not address the issue of security for the granting of such motion under Fed. R. Civ. P. 65(c). Accordingly, the Court has not set security with the issuance of this Order. Without taking a position as to whether a bond is necessary here, see Fairview Mach. & Tool Co., Inc. v. Oakbrook Intern., Inc., 77 F. Supp. 2d 199, 205 (D. Mass. 1999) (noting that "there is ample authority for the proposition that the provisions of Rule 65(c) are not mandatory and that a district court retains substantial discretion to dictate the terms of an injunction bond") (quoting Internat'l Assoc. of Machinists and Aerospace Workers v. Eastern Airlines, Inc., 925 F.2d 6, 9 (1st Cir. 1991)), the Court will give Defendants until November 29, 2018, to make a filing, not to exceed five pages,

19

as to whether they believe security is warranted here and, if so, in what amount. The injunction will, however, be effective immediately. See Gillette Co. v. Norelco Consumer Prods. Co., 946 F. Supp. 115, 140 (D. Mass. 1996).

**So Ordered.**

/s/ Denise J. Casper
United States District Judge