UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

C.A. No. 18-cv-11972

GEOFFREY PESCE,

        Plaintiff,

v.

KEVIN F. COPPINGER, in his official
capacity as Essex County Sheriff,
AARON EASTMAN, in his official
capacity as Superintendent of the Essex
County House of Corrections - Middleton,

        Defendants

**DEFENDANTS KEVIN F. COPPINGER AND AARON EASTMAN'S
MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR
ATTORNEY'S FEES AND LITIGATION EXPENSES**

**INTRODUCTION**

This complaint for injunctive relief—much of it (as will be shown, *infra* at pp. 3-7) a "cut

and paste" from a similar complaint filed in the State of Maine just two months earlier—was

filed on September 19, 2018. Per an order of this Court issued on September 28, 2018 (entry no.

34) a briefing schedule was issued, and the date of November 5, 2018 was assigned   for oral

argument.

No discovery was conducted by the parties.  A one-hour hearing—no witnesses, simply

oral argument by counsel—was held on November , 2018, with the Court taking the matter under

advisement until it issued its decision on November 26, 2018.

For their work in filing the Complaint and attending the hearing, nine (9) plaintiff's

counsel request over $250,000—to be exact, $252,890—in fees.

For the reasons expressed below, Defendants contend that Plaintiff's counsel's billing practice—hourly rates, distribution, number of hours billed, and total amount requested, etc.—is unreasonable, and request this Court to adjust the lodestar downward or alternatively consider an across-the-board rate cut in awarding any fees.

## I.    STATEMENT OF THE CASE

Plaintiff filed a two-count Complaint against the Defendants, alleging that the failure to provide methadone to him upon his admission to the Essex County Sheriff's Department ("ECSD") was a violation of the Eighth Amendment to the U.S. Constitution pursuant to 42 USC Section 1983 (Count I), as well as a violation of the Americans with Disabilities Act ("ADA") (Count II). Plaintiff sought a temporary restraining order, and both preliminary and permanent injunctive relief, specifically requesting this Court to enjoin the Defendants from prohibiting the Plaintiff access to methadone, and order the Defendants to provide methadone as needed for Plaintiff's for opioid use disorder.

A hearing was held before the Court on November 5, 2018, and on November 26, 2018 this Court issued its *Memorandum and Order*, allowing Plaintiff's request for injunctive relief, and thereby ordering Defendants to provide the Plaintiff methadone during his incarceration in the Essex County House of Corrections at Middleton, Massachusetts. No appeal was taken by the Defendants.

Plaintiff thereafter moved for attorney' fees and costs, and the Defendants hereby oppose same.

II.    **ARGUMENT**

A.    **PLAINTIFF'S COMPLAINT COPIES TWO PREVIOUSLY FILED STATE OF MAINE COMPLAINTS ADDRESSING THE SAME ISSUE**

In Plaintiff's Memorandum of Law in Support of his Motion for Award of Attorney's Fees and Litigation Expenses, he indicates that:

> In a span of less than three and half months [sic], Plaintiff's counsel submitted over 2,000 pages of briefing with supporting declarations and exhibits, engaged with six experts, and obtained the relief that Mr. Pesce sought . . .

Plaintiff's counsel would have this Court believe that all of their work in this case was both unique and novel (*See Plaintiff's Memorandum, p.7*).  However, the Complaint itself is eerily similar to two cases filed in Maine by the American Civil Liberties Union – and in some cases a verbatim copy of the Maine complaints.  In *Smith v. Patrick, et al.*, United States District Court for the District of Maine, Docket No. 1:18-CV-00288-NT (hereinafter "*Smith I*") , Plaintiff Zachary Smith filed a complaint (Exhibit A) seeking the same relief as Plaintiff Pesce.   Indeed, Pesce's counsel admit to having "reviewed *Smith* filings as background…" (*Id. at p. 7, footnote 1*).  A closer inspection of the *Smith* complaint, however, reveals more than a simple "review" was done.

Not only were the two causes of action the same – Eighth Amendment and ADA – but the language used in the *Pesce* Complaint in many instances is simply a copy of the Complaint filed in *Smith I*.  Below is a comparison of the two complaints and the similarities thereto:

*Pesce Complaint*, paragraph 9:

9. Despite the medical consensus that MAT is the standard of care for opioid use disorder, Middleton HOC does not provide MAT for male inmates with opioid use disorder, even for individuals like Mr. Pesce who are already taking methadone prescribed by their physician when they enter custody.

*Smith I Complaint*, paragraph 3:

> 3. Despite the medical consensus that MAT is the standard of care for opioid use disorder, the Aroostook County Sheriff's Office and Maine Department of Corrections both have policies prohibiting MAT for opioid use disorder, even for individuals like Mr. Smith who are already taking buprenorphine prescribed by their physician

*Pesce Complaint*, paragraph 10:

> 10. If Mr. Pesce is not provided his prescribed methadone, he will enter acute withdrawal, which is extremely painful and carries a heightened risk for numerous serious medical conditions.

*Smith I Complaint*, paragraph 5:

> 5. Defendants' policies will force Mr. Smith into acute withdrawal, which is extremely painful and carries a heightened risk for numerous serious medical conditions.

*Pesce Complaint* paragraph 12:

> 12. The denial of necessary medical care violates Mr. Pesce's right to be free from discrimination based upon his disability as guaranteed by the Americans with Disabilities Act. Additionally, Defendants' deliberate indifference to Mr. Pesce's serious medical need, and to the suffering and long-term consequences of forced withdrawal, violate Mr. Pesce's constitutional right to be free from cruel and unusual punishment as guaranteed by the Eighth Amendment to the United States Constitution.

*Smith I Complaint* paragraph 6:

> 6. This denial of necessary medical care violates Mr. Smith's right to be free from discrimination based upon his disability as guaranteed by the Americans with Disabilities Act. Additionally, Defendants' deliberate indifference to the suffering and long-term consequences of forced withdrawal violate Mr. Smith's constitutional right to be free from cruel and unusual punishment as guaranteed by the Eighth Amendment to the United States Constitution.

*Pesce Complaint* paragraph 20:

> 20. Opioid use disorder is a chronic brain disease with potentially deadly

complications. Signs of opioid use disorder include craving, increasing tolerance to opioids, the inability to cut back or control opioid use, withdrawal symptoms, and a loss of control.

*Smith I Complaint* paragraph 17:

17. Opioid use disorder is a chronic brain disease with potentially deadly complications. Signs of opioid use disorder include craving, increasing tolerance to opioids, withdrawal symptoms, and a loss of control.

*Pesce Complaint* paragraph 21:,

21. Like other chronic diseases, opioid use disorder often involves cycles of relapse and remission. Without treatment or other recovery, patients with opioid use disorder are frequently unable to control their use of opioids. Opioid use disorder is progressive and can result in disability or premature death, including due to accidental overdose.

*Smith I Complaint,* Paragraph 18:

18. Like other chronic diseases, opioid use disorder often involves cycles of relapse and remission. Without treatment or other recovery, patients with opioid use disorder are frequently unable to control their use of opioids. Opioid use disorder is progressive and can result in disability or premature death.

*Pesce Complaint* paragraph 35:

35. In 2017, the President's Commission on Combating Drug Addiction and the Opioid Crisis found that "[i]n the weeks following release from jail or prison, individuals with or in recovery from [opioid use disorder] are at elevated risk of overdose and associated fatality." The Commission further found that "MAT has been found to be correlated with reduced risk of mortality in the weeks following release and in supporting other positive outcomes," and that "[a] large study of individuals with [opioid use disorder] released from prison found that individuals receiving MAT were 75% less likely to die of any cause and 85% less likely to die of drug poisoning in the first month after release."

*Smith I Complaint*, paragraphs 32 and 33:

32. For example, the President's Commission on Combating Drug Addiction and the Opioid Crisis found that "[i]n the weeks following release from jail or prison, individuals with or in recovery from [opioid use disorder] are at elevated risk of overdose and associated fatality."

33. As the commission further recognized, "MAT has been found to be correlated with reduced risk of mortality in the weeks following release and in supporting other positive outcomes." *Id.* "A large study of individuals with [opioid use disorder] released from prison found that individuals receiving MAT were 75% less likely to die of any cause and 85% less likely to die of drug poisoning in the first month after release." *Id*

*Pesce Complaint* paragraphs 36-40:

36. The American Society of Addiction Medicine, the leading professional society in the country on addiction medicine, also recommends treatment with MAT for people with opioid
use disorder in the criminal justice system.

37. The National Commission on Correctional Health Care has also adopted a position statement calling for the "[c]ontinuation of prescribed medications for substance use
disorders," such as buprenorphine and methadone.

38. The United States Department of Justice's Adult Drug Court Discretionary Grant Program has gone even further, requiring grantees to permit the use of MAT.

39. As recognized by these authorities, opioid use disorder is a chronic relapsing condition that requires medically appropriate treatment just like other chronic diseases. Once
patients start on MAT, they need to be maintained on that treatment under medical supervision to
give them the best chances of success.

40. Forced withdrawal is not medically appropriate for patients being treated with MAT. It disrupts their treatment plan, leading to a seven-fold decrease in continuing MAT after release. Discontinuation of MAT increases the risk of relapse into active addiction. Over 82% of
patients who leave methadone treatment relapse to intravenous drug use within a year. Death is
three times as likely for people out of treatment versus when in treatment.

*Smith I Complaint*, paragraphs 34-38:

34. The American Society of Addiction Medicine, the leading professional society in the country on addiction medicine, also recommends treatment with MAT for people with opioid use disorder in the criminal justice system.

35. The National Commission on Correctional Health Care has also adopted a position statement calling for the "continuation of prescribed medications for substance use disorders," such as buprenorphine and methadone.

36. The United States Department of Justice's Adult Drug Court Discretionary Grant Program has gone even further, requiring grantees to permit the use of MAT.

37. As recognized by these authorities, opioid use disorder is a chronic relapsing condition that requires medically appropriate treatment just like other chronic diseases. Once patients start on MAT, they need to be maintained on that treatment under medical supervision to give them the best chances of success.

38. Forced withdrawal is not medically appropriate for patients being treated with MAT. It disrupts their treatment plan, leading to a seven-fold decrease in continuing MAT after release. Death is three times as likely for people out of treatment versus when in treatment.

*Pesce Complaint* para 41:

41. Reflecting this knowledge, numerous jails and prisons follow the medical standard of practice and allow prisoners to continue with MAT during incarceration. Examples include Bernalillo County Metropolitan Detention Center (New Mexico); Rikers Island Correctional Facility (New York); Kings County Jail (Washington State); Orange County Jail (Florida). The Rhode Island Department of Corrections makes MAT available to all its prisoners, even those (unlike Mr. Pesce) who were not receiving MAT before being incarcerated.

*Smith I Complaint* paragraphs 39-40:

39. Numerous jails and prisons follow medical and policy authorities and allow prisoners to continue with MAT during incarceration. Examples include Bernalillo County Metropolitan Detention Center (New Mexico); Rikers Island Correctional Facility (New York); Kings County Jail (Washington State); Orange County Jail (Florida).

40. The Rhode Island Department of Corrections makes medication-assisted treatment available to all its prisoners, even those (unlike Mr. Smith) who were not receiving MAT before being admitted to prison.


The similarities between the *Pesce* and *Smith I* filings do not end with the Complaint.

Plaintiff Pesce readily admits that one of his expert affiants, Dr. Ross MacDonald, filed

similar material in *Smith I* (*See Plaintiff's Memorandum, p. 7 footnote 1*), including a

similar affidavit and exhibit (*See Smith I docket entry no. 25-11 which matches Pesce*

*docket entry no. 17*).

A second similar Maine complaint (ironically with the surname of Smith, see Exhibit B) filed just two weeks before the instant case, *Smith v. Aroostook County, et. al*., United States District Court for the District of Maine, Docket No. 1:18-CV-00352-NT (hereinafter "*Smith II*") again reveals not only the Dr. MacDonald affidavit and exhibits (Exhibit C, *Smith II* docket entries 9-12, 9-13) but again shows the striking similarities in the wording of all three complaints (*see e.g. Smith I Statement of Facts and Smith II  facts, respectively*).

The point of all this is that the *Pesce* Complaint relied heavily on two similar previously-filed Maine complaints, both of which had volumes of data and affidavits for which *Pesce* relied. *Pesce's* counsel should not be awarded a windfall for reorgainizing that material in a different fashion and passing it off as original and novel.

## B.    PLAINTIFF'S REQUESTED HOURLY RATES ARE UNREASONABLE

Not only were these items billed excessively, but they were billed at astronomical rates as well.  The promise of attorney's fees for prevailing parties pursuant to 42 U.S.C. § 1988 are intended to give incentive "to attract competent counsel" so that they will represent individuals claiming their civil rights have been violated.  *Hensley v. Eckerhart*, 461 U.S. 424, 444, 103 S. Ct. 1933, 1945 (1983) (*quoting* S. Rep. No. 94-1011, p. 6 (1976)).  However, "fee awards under § 1988 were never intended to 'produce windfalls to attorneys.'"  *Riverside v. Rivera, supra*, at 580 (plurality opinion) (*quoting* S. Rep. No. 94-1011, p. 6 (1976)).

Plaintiff's requested *discounted* hourly rates for Goodwin attorneys Ira Levy of  $672 (2018) and $696 (2019),  Lana Shiferman of $600, Robert Frederickson of $516 (2018) and $528 (2019), Alexandra Valenti $492 (2018) and $522 (2019), Jenny Zhang $474, Michael Pickett  $264 65.2 (2018) and $288 (2019) and for ACLU attorneys Matthew Segal of $625.00 Jessie Rossman of $525.00, Daniel McFadden of $525.00 are unreasonable. In determining an appropriate rate, this Court is to consider, among other things, the rates "prevailing in the

community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum*, 465 U.S. at 895, n.11. The burden is on Plaintiff is to establish the reasonableness of her requested rate. *Id*. at 897. When fees are assessed against the opposing party, a reasonable rate is dependent "not on what the attorney usually charges but, rather, on what his services are objectively worth." *Haddad v. Wal-Mart Stores, Inc.*, 455 Mass. 1024, 1026 (2010) (quoting *Heller v. Silverbranch Constr. Corp.*, 376 Mass. 621, 629 (1978)). "A reasonable attorney's fee is one that is adequate to attract competent counsel, but that does not produce windfalls to attorneys." *Perdue v. Kenny A. ex rel. Winn.*, 559 U.S. 542, 552 (2010) (internal quotation omitted). This Court "is not bound by the hourly rate requested by the victor's counsel." *Bogan v. City of Boston*, 489 F. 3d 417, 429 (1st Cir. 2007) (internal quotation omitted).

Defendants respectfully submits that Plaintiff has not met his burden to show that his requested rates for Goodwin senior partners Levy, Shiferman, partner Frederickson, and senior associates Valenti  and Zhang are reasonable under this standard. Plaintiff does not cite a single case justifying the rates Mr. Pesce's counsel seek that reasonably reflect the novelty and complexity of the issues raised in the litigation.

District of Massachusetts courts have repeatedly awarded rates of far less than $600 (or$525) per hour for experienced partners in non-class action cases. *See, e.g.*, *Jin Hai Li*, 273 F. Supp. 3d at 293 (attorney with 20+years of experience awarded $300/hour);*Anderson v. Brennan*, 267 F. Supp. 3d. 270, 274 (D. Mass. 2017) (awarding$325/hour to counsel in Title VII employment case);*Rudy v. City of Lowell*, 883 F. Supp.2d 324, 327(D. Mass. 2012) (reducing hourly rate from $450 to $360 for attorney with "extensive experience in employment law"); *Meagher v. Andover School Committee*, 2016 WL 70447, *3-6

(D. Mass. Jan. 6, 2016) (reducing hourly rate for lead attorney with 45 years of experience from $800 to $450); *see also Barrow v. Barrow*, 2017 WL 2953636, *5 (D. Mass. July 10, 2017) (reducing hourly rate of partner with 20 years of experience in employment law to $300);*Fryer v. A.S.A.P. Fire and Safety Corp., Inc.*, 750 F. Supp. 2d 331, 339 (D. Mass 2010)(awarding $350 an hour for an attorney who had been practicing for over 40 years and "concentrates exclusively in the representation of employees" and $325 per hour for a 35-year attorney with "extensive experience representing employees in employment cases").

Based on these District of Massachusetts cases and the fact that this was  a single-plaintiff employment law case litigated by a small firm, Defendants respectfully submits that a rate of $475 for senior partners Levy and Shiferman, $400 for partner Frederickson, and $300 for senior associates Valenti  and Zhang and $175 for associate Pickett is the upper limit of a reasonable rate.

Regarding ACLU lawyers Segal, Rossman, and McFadden, it is worth noting that both plaintiff in *Smith I and Smith II* were represented by ACLU Attorneys Emma Bond and Zachary Heiden, with *Smith I* having additional ACLU Attorney Gabriel Eber as well.  All three have similar experience as *Pesce* counsel Segal, Rossman and McFadden—yet Eber's requested hourly rate was $480 (*Exhibit C, Smith I Motion for Attorney's Fees, p. 15*), Heiden's requested hourly rate $300 (*Id.*) or $325 (*Exhibit C and Exhibit D, Smith II Motion for Attorney's Fees* ), and Bond's requested hourly rate $250 or $300 (*Exhibit C and Exhibit D*).   Fees of $400, $300 and $275 for Attorneys Segal, Rossman, and McFadden, respectively, are the upper limit of a reasonable rate.

Finally, the affidavits that Plaintiff submits from other lawyers do not change this analysis. First, what Plaintiff lawyers think other Plaintiff lawyers are worth is not necessarily the type of objective evidence to be relied upon in determining a reasonable hourly fee. Second, the affidavits base at least part of their conclusion that the proposed rates are reasonable on the hourly billing rates that Boston firms charge. However, as multiple courts in this district have noted, law firms' listed

billing rates are not a good standard for determining reasonable court-awarded attorney's fees. For example, in *Tyler v. Michaels Stores, Inc.*, Plaintiffs' class counsel argued that their rates were reasonable because they were on par with rates charged at other Boston law firms. 150 F. Supp. 3d 53, 69 (D. Mass. 2015). The District Court rejected this comparison, however, stating "published billing rates are of little aid to a court in establishing the actual market for the legal services provided [in Boston]." *Id*. at 70 (quoting *McDonough v. City of Quincy*, 353 F. Supp. 2d 179, 187 (D. Mass. 2005)). As the Court explained, "while partners may ostensibly bill a certain dollar amount, that is not, in fact, necessarily the amount they expect to be paid." *Tyler*, 150 F. Supp. 3d at 69. The Court rejected Plaintiff's request that partners be compensated at $650 per hour and instead awarded $350, finding that number is akin to the hourly rate awarded to experienced civil rights attorneys. *Id*. at 70; *see also Metropolitan Dist. Comm'n*, 847 F. 2d at 17 (noting that law firm billing rates are of limited value in fee determination setting; in private practice those rates are discussed with the client ahead of time and often negotiated; in the fee determination setting, no such negotiation can occur); *Estate of McIntyre v. United States*, 739 F. Supp. 2d 70, 77 (D. Mass. 2010) (noting that listed billing rates "do not represent the actual rates being paid to Boston law firms" and thus do not "reflect a realistic yield" and awarding rate of $300 per hour for partners and $100 for associates and paralegals). Thus, the affidavits are not sufficient to establish that Plaintiff's requested hourly rates for an individual employment case are reasonable.

## C. PLAINTIFF BEARS THE BURDEN OF PROVING REASONABLENESS OF ATTORNEY'S FEES

As a fee applicant, the Plaintiff's counsel bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and reasonable hourly rates. *Hensley v. Eckerhart*, 461 U.S. 424,437 (1983). The attorney's account of the value of the legal services and the amount of time spend

must be scrutinized with care.  *Grendel's Den, Inc. v. Larkin,* 749 F.2d 945, 950 (1st. Cir. 1984).  The Court is obligated to make an independent assessment of what constitutes a reasonable award.  *Ciulla v. Rigny,* 89 F.Supp.2d 97, 104 (D. Mass. 2000).

In making a fee request, counsel for the prevailing party must exercise "billing judgment," that is, they "should make a good faith effort to exclude from a fee request hours that are excessive, redundant or otherwise unnecessary[.]" *Hensley,* 461 U.S. at 434. Moreover, it is "the court's prerogative (indeed, its duty) to winnow out excessive hours, time spent tilting at windmills, and the like." *Gay Officers Action League v. Puerto Rico,* 247 F.3d 288, 296 (1st. Cir. 2001).  A reasonable fee is one that is "adequate to attract competent counsel, but which [does] not produce windfalls to attorneys." *Blum v. Stenson,* 465 U.S. 886, 893 (1984).  General entries within a plaintiffs time records are to be avoided where they prevent the disputing party from being able to challenge either the records' accuracy or the reasonableness of the time spent on the particular task. *Lipsett v. Blanco,* 975 F.2d 934, 938 (1st. Cir. 1992).

A court's "role as the guarantor of fairness obligates it not to accept uncritically what lawyers self-servingly suggest is reasonable compensation for their services. Rather, the court should scrutinize fee applications carefully." *Weinberger v. Great Northern Nekoosa Corp.,* 925 F. 2d 518, 525 (1st Cir. 1991). Under federal law, reasonable attorney's fees are usually determined by the "lodestar" method, the basic measure of which is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. *Blum v. Stenson,* 465 U.S. 886, 888 (1984). "When legal expenses are collected from a party other than the one who received the legal services, a degree of conservatism in fee determination is in order." *Smith v. Consalvo,* 37 Mass. App. Ct. 192, 196 (1994) (citations omitted). The fee petition

"need not be swallowed whole by the client's litigation adversary just because it *is* the law firm's bill." *United States v. Metropolitan Dist. Comm'n*, 847 F. 2d 12, 17 (1st Cir. 1988) (emphasis in original). The Court "has a right--indeed, a duty--to see whether counsel substantially exceeded the bounds of reasonable effort." *Id*. at 17 (internal quotation omitted). "In these and other ways, the trial court, though adhering to the time-and-rate-based method of fee calculation, may fashion a lodestar which differs substantially from the fee requested by the prevailing party." *Coutin v. Young & Rubicam Puerto Rico, Inc.*, 124 F.3d 331, 337 (1st Cir. 1997).

> "In crafting its lodestar, the trial court may adjust the hours claimed to remove time that was unreasonably, unnecessarily or inefficiently devoted to the case, and subject to principles of interconnectedness, the trial court may disallow time spent litigating failed claims." *De Jesus Nazario v. Morris Rodriguez,* 554 F.3d 196, 207 (1st. Cir. 2009) (internal citations omitted). "It also may adjust the lodestar itself, upwards or downwards, based on any of several different factors, including the results obtained and the time and labor actually required for the efficacious handling of the matter." *Torres-Rivera v. O'Neill- Cancel,* 524 F.3d 331, 336 (1st. Cir. 2008).

It should be noted that "there are a variety of ways in which a trial court can fashion the lodestar." *Matalon v. Hynnes*, 806 F.3d 627 (1st Cir. 2015). One such method is the "distinguishing between core and non-core tasks." *Id*. "It is common in the First Circuit to distinguish between "core" work and "non-core" work, and to compensate attorneys accordingly." *Parker v. Town of Swansea*, 310 F. Supp. 2d 376, 391 (D. Mass. 2004). Core tasks, which are billed at a higher rate, have been identified as "legal research, writing of legal documents, court appearances, negotiations with opposing counsel, monitoring and implementation of court orders." *Id*. (*quoting Brewster v. Dukakis*, 3 F.3d 488, 492 n.4 (1st Cir. 1993)). Whereas "less demanding" non-core tasks are those billed at a lower rate and have been identified as "letter writing and telephone conversations." *Parker* at 391.

A thorough examination of the fee petition submitted by the Plaintiffs reveal a failure to differentiate between core asks and non-core tasks associated with this case. It is well established in the First Circuit that a fee applicant bears the burden of submitting detailed, contemporaneous time records in support of the application. *Deary v. City of Gloucester,* 789 F. Supp. 61, 64 (D. Mass.), *aff'd,* 9 F.3d 191 (1st. Cir. 1993) (citing *Wojtkowski v. Cade,* 725 F.2d 127, 130-31 (1st. Cir. 1984). This Court should look to the Plaintiffs fee petition and distinguish between "core" and "non-core" work. *Ciulla v. Rigny,* 89 F. Supp. 2d 97, 104-05 (D. Mass. 2000) (Young, C.J.).

In order to determine a reasonable hourly rate, the First Circuit and United States District Court of Massachusetts have held that "the Court must find the prevailing hourly rate in Boston for attorneys of comparable skill, experience and reputation" as that of plaintiffs' Attorneys Sinsheimer, Stoker and Thomas. *Martino v. Mass. Bay Transp. Auth.*, 230 F. Supp. 2d 195, 205 (D. Mass. 2002). The burden is on the Plaintiff to provide the Court with "affidavits and other forms of evidence that: 1) establish his lawyers' skills and experience, and 2) inform the Court of the prevailing market rate in the community for attorneys with such qualifications." *Id.* Nevertheless, "As with the tabulation of reasonable hours, the Court should not accept attorney submissions at face value but rather should 'assign more realistic rates to time spent.'" *Guckenberger v. Bos. Univ.*, 8 F. Supp. 2d 91, 103 (D. Mass. 1998) (*quoting Coutin v. Young & Rubicam P.R.,* 124 F.3d 331, 337 (1st Cir. 1997)).

Within this analytical framework, it is evident that a reasonable calculation of the attorneys' fees under the lodestar approach calls for a substantial reduction in the fees sought by Plaintiffs' counsel. The bills submitted by counsel seek fees for duplicative, excessive, vague and block-billed work. Further, the bills submitted seek hourly rates in

excess of the prevailing rate in the Boston community for lawyers with like skills and experience and fail to distinguish between "core" and "non-core" work.

Lastly, the fees awarded must be further adjusted to reflect the "quantum of success achieved," which was for *injunction relief, and not a trial on the merits.* Compare the Plaintiff's request for over $250,000 in this case with *Smith II,* a case that entailed three months of discovery that included traveling all over the country to conduct expert depositions, a five-day hearing, and an appeal (See Exhibits C and D, *Smith II's* docket sheet and Motion for Award of Attorney's Fees and expenses, p 20, respectively)—with an attorney's fee request of just over $258,000. Accordingly, Defendants ask this Court to strike the above-fee requests as excessive, and any award for attorneys' fees must be substantially reduced.

### i. <u>Duplicative Billing</u>

In the event a Court finds that a firm has engaged in duplicitous billing practices by overstaffing the number of attorneys assigned to the same tasks, the Court may dramatically reduce the lodestar amount to penalize counsel for making a bad faith request for compensation. *See Williams v. Poulos*, Nos. 94-2057, 94-2058, 1995 U.S. App. LEXIS 10667 (1st Cir. May 12, 1995) (upholding decision of the District Court to reduce the attorney's fees award for duplicative efforts and modifying the deduction amount from $100,000.00 to $40,000.00). In assessing a fee petition, a Court should, "ordinarily greet a claim that several lawyers were required to perform a single set of tasks with healthy skepticism." *Lipsett v. Blanco*, 975 F.2d 934, 938 (1st Cir. 1992). Further, "hours expended on research or drafts of the same content by two or more lawyers, or attendance of two or more lawyers at a court hearing or conference when one attorney would have sufficed, may and in fact ought be deducted from the hours claimed." *EEOC v. AutoZone, Inc.*, 934 F. Supp. 2d 342, 350 (D. Mass. 2013) (*citing Hart v.*

*Bourque*, 798 F.2d 519, 523 (1st Cir. 1986)).   Below is a chart showing how Plaintiffs' Counsel

has billed excessively for duplicative tasks being performed by multiple attorneys.  Such tasks

include reviewing various documents, meetings with third parties, excessive inter-office counsel

conferences, attendance at hearings, excessive drafting of documents, preparation for and

attendance at depositions, and researching expert witnesses.

Examples of duplicative are listed in the chart below, and Defendants move that they be

stricken as being duplicative:

## DUPLICATIVE BILLING ENTRIES

Goodwin Attorneys

| DATE | TIMEKEEPER | TASK | TIME | AMOUNT |
|---|---|---|---|---|
| 09.08.2018 | I. Levy | Research for potential experts | 1.1 (BB) | $739.20 |
| 09.10.2018 | R. Frederickson | Investigate potential opioid experts | 6.5 (BB) | $3,354.00 |
| 09.12.2018 | A. Valenti | Search for experts | 1.1 (BB) | $541.20 |
| 09.13.2018 | I. Levy | Attention to potential experts | .4 | $268.80 |
| 09.10.2018 | I. Levy | Participate in multiple calls on strategy | 2.7 (BB) | $1,814.40 |
| 09.10.2018 | M. Pickett | Participate in multiple calls on strategy | 2.8 (BB) | $739.20 |
| 09.10.2018 | J. Zhang | Teleconferences with team concerning case strategy and planning; teleconference with ACLU team to discuss strategy and next steps | 2.5 (BB) | $1,185.00 |
| 09.11.2018 | I. Levy | Review and revise DOC demand letter | .6 (BB) | $403.20 |
| 09.11.2018 | A. Valenti | Revise demand letter | .1 | $49.20 |
| 09.11.2018 | J. Zhang | Review and revise demand letter | 4.0 (BB) | $1,896.00 |
| 09.13.2018 (Billed twice) | R. Frederickson | Attend to case strategy | .2 | $103.20 |
| 09.14.2018 | A. Valenti | Attend team teleconference; attend to emails regarding briefing and declarations | .6 (BB) | $295.20 |
| 09.14.2018 | J. Zhang | Call with team concerning case status and TRO filing; email ACLUM team regarding Potee declaration | 2.6 (BB) | $1,232.40 |
| 09.17.2018 | I. Levy | Participate in multiple strategy calls | 1.4 (BB) | $940.80 |

| 09.17.2018 | A. Valenti | Attend team teleconference | .9 (BB) | $442.80 |
|---|---|---|---|---|
| 09.17.2018 | J. Zhang | Call with team concerning filing | 5.5 (BB) | $2,607.00 |
| 09.18.2018 | R. Frederickson | Review and revise draft declarations, complaint, and briefs | 4.6 (BB) | $2,373.60 |
| 09.18.2018 | I. Levy | Review and revise draft papers | 2.3 (BB) | $1,545.60 |
| 09.18.2018 | A. Valenti | Attend team teleconference | 2.9 (BB) | $1,426.80 |
| 09.18.2018 | J. Zhang | Call with ACLUM team regarding PI filing | 6.9 (BB) | $3,270.60 |
| 09.19.2018 | R. Frederickson | Attend to finalizing papers and conferring with team regarding effecting process | 7.6 | $3,921.60 |
| 09.19.2018 | I. Levy | Review final papers and attend to strategy around proceeding | 1.8 | $1,209.60 |
| 09.19.2018 | A. Valenti | Finalize declarations | 2.8 (BB) | $1,377.60 |
| 10.03.2018 | A. Valento | Review and revise public records request | .2 | $94.80 |
| 10.04.2018 | M. Pickett | Revise public records request letter | .7 | $184.80 |
| 10.18.2018 | A. Valenti | Draft expert declaration | .9 | $442.80 |
| 10.18.2018 | J. Zhang | Draft MacDonald declaration | 1.2 (BB) | $568.80 |
| 10.19.2018 | J. Zhang | Draft MacDonald declaration | 1.8 (BB) | $853.20 |
| 10.20.2018 | A. Valenti | Attend team teleconference regarding reply brief | 1.2 (BB) | $590.40 |
| 10.20.2018 | J. Zhang | Call with ACLU team concerning drafting of reply | 1.3 (BB) | $616.20 |
| 11.05.2018 | R. Frederickson | Prepare for and attend oral argument on motion for temporary restraining order and preliminary injunction | 6 (BB) | $3,096.00 |
| 11.05.2018 | I. Levy | Appear for Pesce hearing in Boston | 4.5 | $3,024.00 |
| 11.05.2018 | M. Pickett | Attend hearing on preliminary injunction | 4.1 | $3,024.00 |
| 11.05.2018 | A. Valenti | Prepare for oral argument; attend same | 7.2 (BB) | $3,542.40 |
| 11.27.2018 | R. Frederickson | Analyze Judge Casper's order; coordinate with team regarding the same | 1.1 (BB) | $567.60 |
| 11.27.2018 | I. Levy | Review order on motion for preliminary injunction; attend to consideration of next steps | .9 (BB) | $604.80 |
| 11.27.2018 | I. Levy | Prepare for and participate in strategy call | .7 (BB) | $470.40 |
| 11.27.2018 | A. Valenti | Attend team teleconference regarding decision on preliminary injunction | 1.1 (BB) | $541.20 |
| 12.27.2018 | R. Frederickson | Consider strategy for next steps in the case | .3 | $154.80 |
| 12.27.2018 | M. Pickett | Confer with Ms. Valenti, Mr. Frederickson, and Ms. Korin | .6 | $158.40 |

| DATE | | TASK | | |
|---|---|---|---|---|
| | | regarding going forward strategy | | |
| 12.27.2018 | A. Valenti | Confer with Mr. Frederickson and team regarding strategy for remainder of case | .4 | $196.80 |

ACLU – Attorneys

| DATE | TIMEKEEPER | TASK | TIME | AMOUNT |
|---|---|---|---|---|
| 09.10.2018 | D. McFadden | Telephone counsel with co-counsel | 4.0 (BB) | $2100 |
| 09.10.2018 | J. Rossman | Call with cooperating counsel about strategy | .4 | $210 |
| 10.16.2018 | M. Segal | Confer with J. Rossman and D. McFadden about next steps | .17 | $106.25 |
| 10.16.2018 | J. Rossman | Discuss Pesce hearing w/ Matt and Dan | .25 | $131.25 |
| 10.20.2018 (Billed twice) | J. Rossman | Phone call | .30 | $157.50 |
| 10.20.2018 | D. McFadden | ACLUM teleconference regarding response strategy; Goodwin and ACLU teleconference regarding response strategy | 2.00      BB) | $1050 |

## ii.    **Vague Billing**

"It is well settled that in the context of § 1988 fee petitions 'the absence of detailed contemporaneous time records, except in extraordinary circumstances, will call for a substantial reduction in any award or, in egregious cases, disallowance.'"  *Parker v. Town of Swansea*, 310 F. Supp. 2d 376, 392 (D. Mass. 2004) (*quoting Grendel's Den, Inc. v. Larkin,* 749 F.2d at 952 (1st Cir. 1984)).  The billing entries submitted by Plaintiffs' Counsel contain several vague entries by the attorneys and the paralegal.  Vague entries such as these are not appropriate for a fee award.  Additionally, these entries place an unnecessary burden on the Defendant as it makes it difficult to decipher possible duplicitous or excessive billing entries amongst the three

attorneys and the paralegal.  The Defendant requests that the Court disallow entries billed in this manner below, or in the alternative, reduce the award granted to Plaintiffs' Counsel.

## VAGUE BILLING ENTRIES

Goodwin Attorneys

| DATE | TIMEKEEPER | TASK | TIME | AMOUNT |
|------|-----------|------|------|--------|
| 09.10.2018 | A. Valenti | Review for complaint and TRO filing | 1.4 | $688.80 |
| 09.11.2018 | R. Frederickson | Analyze and review records | 1.3 | $670.80 |
| 09.12.2018 | I. Levy | Review additional documents from Mr. Pesce | 1.4 | $940.80 |
| 09.13.2018 | I. Levy | Attention to potential experts | .4 | $268.80 |
| 09.13.2018 | M. Pickett | Prepare to file complaint | .5 | $132.00 |
| 09.14.2018 | M. Pickett | Prepare to file complaint and TRO | 4.1 | $1,082.40 |
| 09.15.2018 | M. Pickett | Prepare to file complaint | .5 | $132.00 |
| 09.17.2018 | M. Pickett | Prepare to file complaint | 6 | $1,584.00 |
| 09.18.2018 | M. Pickett | Prepare to file complaint and TRO | 1.5 | $396.00 |
| 09.18.2018 | M. Pickett | Prepare to file complaint | 1.5 | $396.00 |
| 09.25.2018 | I. Levy | Attend to strategy | .3 | $154.80 |
| 10.27.2018 | M. Pickett | Post-filing clean up | .2 | $52.80 |
| 11.29.2018 | M. Pickett | Review correspondence | .3 | $79.20 |
| 11.30.2018 | M. Pickett | Review correspondence | .1 | $26.40 |
| 01.28.2019 | M. Pickett | Review correspondence | .1 | $28.80 |

ACLU Attorneys

| DATE | TIMEKEEPER | TASK | TIME | AMOUNT |
|------|-----------|------|------|--------|
| 09.05.2018 | J. Rossman | Talk with Geoff | 0:35:00 | |
| 09.07.2018 | J. Rossman | Talk to Geoff's dad | 0:20:00 | |
| 09.07.2018 | J. Rossman | Email cooperating counsel | 0:15:00 | |
| 09.17.2018 | J. Rossman | Conversation with Dr. Yuasa | 0:30:00 | |
| 10.20.2018 (Billed twice) | J. Rossman | Phone call | 0:30:00 | |
| 10.23.2018 | J. Rossman | Email | 0:29:42 | |
| 10.23.2018 | J. Rossman | Call with Dr. Yuasa | 0:03:44 | |
| 10.23.2018 | J. Rossman | Call with Dr. Yuasa | 0:20:00 | |
| 10.23.2018 | J. Rossman | Call with Geoff | 0:05:00 | |
| 10.31.2018 | J. Rossman | Call with Geoff | 0:10:21 | |
| 11.15.2018 | J. Rossman | Call with Geoff | 0:04:48 | |
| 11.15.2018 | J. Rossman | Email cooperating counsel | 0:02:27 | |
| 11.15.2018 | J. Rossman | Call with Geoff | 0:16:28 | |
| 11.16.2018 | J. Rossman | Call with Geoff and Matt S. | 0:26:05 | |
| 11.16.2018 | J. Rossman | Call with Geoff | 0:00:47 | |

### iii.    __Block Billing__

Plaintiffs' Counsel has engaged in a substantial amount of block billing.  This practice is defined as "the time-keeping method by which an attorney lumps together the total daily time spent working on a case, rather than itemizing the time expended on specific tasks." *Torres-Rivera v. Espada-Cruz*, No. CIVIL 99-1972CCC, 2007 U.S. Dist. LEXIS 20625, at *4-5 (D.P.R. Feb. 23, 2007).  Block billing "can make it impossible for the court to determine the reasonableness of the hours spent on each task…" *Id.* at 5.  "A review of the case law reflects that the method most often used to compensate for block billing is a flat reduction of a specific percentage from the award." *Id.* (*See* Exhibit 10, ¶8).  Further, it has been held that,

> [A] district court does not abuse its discretion in reducing  a plaintiff's fee request when the request is based on time records that are 'rather sloppy and imprecise.' We have always required lawyers to keep "meticulous time records that 'reveal . . . all hours for which compensation is requested and how those hours were allotted to specific tasks.'

*Id.* (*quoting Robinson v. City of Edmond*, 160 F.3d 1275, 1284-85 (10th Cir. 1998)).

Courts have issued flat reductions from the fee award ranging from 15% - 35%. *See e.g., Delgado v. Village of Rosemont,* 2006 U.S. Dist. LEXIS 80284, 2006 WL 3147695 (N.D.Ill.) (reduction of total fees by 35% for vagueness, block billing and lack of detail); *Phoenix Four, Inc., v. Strategic Resources Corporation,* 2006 U.S. Dist. LEXIS 52402, 2006 WL 2135798 (S.D.N.Y.) (fee award reduced by 25% for block billing); *Association of Holocaust Victims for Restitution of Artwork and Masterpieces v. Bank Austria Creditanstalt,* 2005 U.S. Dist. LEXIS 28880, 2005 WL 3099592, at *7 (S.D.N.Y.); (reduction of award by 25% for block billing, excessive hours, and vagueness in time entries); *Sea Spray Holdings, Ltd. v. Pali Financial Group Inc.,* 277 F. Supp. 2d 323, 326 (S.D.N.Y. 2003) ("because of . . . the inherent difficulties the court would encounter in attempting to parse out reasonable hours and manpower for

appropriate tasks, the court finds that a 15% "flat reduction of fees . . . is warranted.")." *Torres-Rivera v. Espada-Cruz*, No. CIVIL 99-1972CCC, 2007 U.S. Dist. LEXIS 20625, at \*6-7 (D.P.R. Feb. 23, 2007).

Here, Plaintiffs' Counsel has submitted a vast amount of billing entries in which multiple tasks are billed and it is impossible to decipher how much time was spent on each task. This has placed an unreasonable burden on Defendants' counsel in preparing the instant memorandum. Plaintiffs' Counsel utilized block billing quite frequently throughout the three-year litigation process. Entries such as those below make it impossible for the Court to determine whether a reasonable amount of time was spent on each task, as they lump groups of tasks together. Further, several of these lumped-together entries include time spent on non-core tasks, time spent on an unsuccessful Plaintiff(s) (discussed below) and duplicative tasks. Therefore, the Defendant requests that this Court make a flat reduction of a percentage of the award granted to Plaintiffs' Counsel.

## BLOCK BILLING ENTRIES

Goodwin Attorneys

| DATE | TIMEKEEPER | TASK | TIME | AMOUNT |
|---|---|---|---|---|
| 09.08.2018 | R. Frederickson | Analyze complaint and perform legal research regarding ADA claims; draft complaint | 4.3 | $2,218.80 |
| 09.10.2018 | R. Frederickson | Investigate potential opioid experts; prepare for and attend conference call with ALCUM; revise draft TRO and Pl motion; research ADA and Eighth Amendment claims | 6.5 | $3,354.00 |
| 09.17.2018 | R. Frederickson | Revise draft papers; confer with team regarding filing strategy | 8.1 | $4,179.60 |
| 09.18.2018 | R. Frederickson | Review and revise draft declarations, complaint, and briefs; confer with team regarding strategy for finalizing the same | 4.6 | $2,373.60 |
| 09.19.2018 | R. Frederickson | Attend to finalizing papers and conferring with team regarding | 7.6 | $3,921.60 |

| | | effecting process | | |
|---|---|---|---|---|
| 09.20.2018 | R. Frederickson | Analyze order from Judge Casper and meet and confer with counsel for Defendants; confer with team regarding the same | 5.9 | $3,044.40 |
| 09.21.2018 | R. Frederickson | Attend to finalizing submission to Court regarding continuance of criminal matters; confer with team regarding [redacted] | 2.1 | $1,083.60 |
| 09.22.2018 | R. Frederickson | Exchange emails regarding hearings; prepare for the same | .8 | $412.80 |
| 09.24.2018 | R. Frederickson | Prepare for and attend criminal hearing in Ipswich; confer with Ms. Valenti regarding next steps | 3.8 | $1,960.80 |
| 09.29.2018 | R. Frederickson | Analyze articles related to Maine case; prepare for oral argument and reply briefs | .7 | $361.20 |
| 10.16.2018 | R. Frederickson | Revise response to motion for extension of time; attend to emails regarding draft strategy | 1.8 | $928.80 |
| 10.20.2018 | R. Frederickson | Analyze opposition papers; prepare for and participate in strategy call | 1.3 | $670.80 |
| 10.25.2018 | R. Frederickson | Revise draft reply brief; confer with team regarding strategy | 1.4 | $722.40 |
| 11.27.2018 | R. Frederickson | Analyze Judge Casper's order; coordinate with team regarding the same | 1.1 | $567.60 |
| 09.08.2018 | I. Levy | Review materials from Maine case and other background materials; research for potential experts | 1.1 | $739.20 |
| 09.10.2018 | I. Levy | Work on Pesce ACLU matter; participate in multiple calls on strategy | 2.7 | $1,814.40 |
| 09.11.2018 | I. Levy | Review and revise DOC demand letter; continue review and analysis of background documents | .6 | $403.20 |
| 09.14.2018 | I. Levy | Review and revise complaint; attention to case strategy; review expert materials | 2.4 | $1,612.80 |
| 09.16.2018 | I. Levy | Review and revise declaration of Mr. Pesce; attend to review of TRO memorandum | 2.6 | $1,747.20 |
| 09.17.2018 | I. Levy | Review draft TRO memo; review Pesce declaration; participate in multiple strategy calls | 1.4 | $940.80 |
| 09.18.2018 | I. Levy | Review and revise draft papers; attend to filing and motion strategies and contingencies relating thereto | 2.3 | $1,545.60 |

| 09.21.2018 | I. Levy | Review order; attention to strategy around continuance in matter in other forums | 1.8 | $1,209.60 |
|---|---|---|---|---|
| 09.26.2018 | I. Levy | Continue review of potential additional experts; review and revise proposed briefing and scheduling order, and discussions around strategy regarding same | 1.1 | $739.20 |
| 11.02.2018 | I. Levy | Review court filings; assist in preparations for oral argument | 1.7 | $1,142.40 |
| 11.26.2018 | I. Levy | Study Judge Caspar opinion granting injunction; attention to analyzing continued strategy going forward | .8 | $537.60 |
| 11.27.2018 | I. Levy | Review order on motion for preliminary injunction; attention to consideration of next steps | .9 | $604.80 |
| 09.10.2018 | M. Pickett | Participate in multiple calls on strategy; research background of case | 2.8 | $739.20 |
| 09.12.2018 | M. Pickett | Prepare to file complaint; attend meeting with client | 4.3 | $1,135.20 |
| 10.18.2018 | M. Pickett | Draft email to Ed Hayes concerning public records request; review declarations | 1.1 | $290.40 |
| 09.10.2018 | J. Zhang | Teleconferences with team concerning case strategy and planning; Teleconferences with team concerning case strategy and planning; teleconference with ACLU team to discuss strategy and next steps; review case background documents; draft Potee declaration | 2.5 | $1,185.00 |
| 09.11.2018 | J. Zhang | Review and revise demand letter; review Maine filings and materials on MAT; draft Pesce declaration | 4.0 | $1,896.00 |
| 09.12.2018 | J. Zhang | Email ACLUM team regarding contact with expert; draft Potee declaration; call with ACLUM team concerning TRO/PI fling | 1.1 | $521.40 |
| 09.14.2018 | J. Zhang | Call with team concerning case status and TRO filing; revise Potee Declaration per Mr. Frederickson's comments; email ACLUM team regarding Potee declaration; call with Dr. Potee and ACLUM team concerning declaration | 2.6 | $1,232.40 |
| 09.15.2018 | J. Zhang | Revise Complaint; prepare for call with Dr. Potee; call with Dr. Potee | 7.0 | $3,318.00 |

| | | regarding declaration; email team regarding call with Dr. Potee; revise Potee declaration per call with Dr. Potee; email team regarding revised Potee declaration | | |
|---|---|---|---|---|
| 09.16.2018 | J. Zhang | Revise Potee declaration per comments from Dr. Potee, ACLUM, and team; email Dr. Potee concerning revisions to declaration | 2.5 | $1,185.00 |
| 09.17.2018 | J. Zhang | Revise Potee declaration per comments from Dr. Potee and team; email team regarding revisions, review draft papers for filing; review exhibits provided by Ms. Korin; call with team concerning filing | 5.5 | $2,607.00 |
| 09.18.2018 | J. Zhang | Call with ACLUM team regarding PI filing; review Potee declaration exhibits prepared by Ms. Korin; draft proposed order and cover motion for preliminary injunction; call with Mr. McGurrin (Court Procedures) concerning bond requirement for temporary restraining order | 6.9 | $3,270.60 |
| 09.19.2018 | J. Zhang | Coordinate filing and service of PI/TRO papers; teleconference with Ms. Korin, Mr. McGurrin, and Ms. Orpilla (Court Procedures) concerning manner of service and order of filing; review all papers prior to filing; email case team and Court Procedures team concerning filing status | 7.6 | $3,602.40 |
| 09.20.2018 | J. Zhang | Review and revise draft motion for expedited hearing; email team concerning service of documents; review and revise notice of service; email team regarding order denying motion; conference with ACLUM team concerning response to Judge Casper's order regarding expedited briefing | 2.7 | $1,279.80 |
| 09.21.2018 | J. Zhang | Review filings and correspondence with opposing counsel; email as-filed documents to Dr. Potee | .4 | $189.60 |
| 09.24.2018 | J. Zhang | Call with ACLU concerning next steps in litigation; call with Ms. Valenti concerning draft documents | 1.3 | $616.20 |

| 10.04.2018 | J. Zhang | Email Dr. Potee concerning [redacted for privilege]; review public information request | .2 | $94.80 |
|---|---|---|---|---|
| 10.16.2018 | J. Zhang | Review and revise opposition to motion or continuance per ACLU's comments; coordinate filing of opposition | 1.5 | $711.00 |
| 10.17.2018 | J. Zhang | Draft email to Defendants' counsel concerning failure to file timely complaint; email Mr. Pickett concerning request for documents from Franklin County | .3 | $142.20 |
| 10.18.2018 | J. Zhang | Draft MacDonald declaration; email Mr. Pesce concerning [redacted for privilege]; email team concerning [redacted for privilege] | 1.2 | $568.80 |
| 10.19.2018 | J. Zhang | Draft MacDonald declaration; review Defendants' opposition | 1.8 | $853.20 |
| 10.20.2018 | J. Zhang | Review Defendants' opposition; call with ACLU team concerning drafting of reply | 1.3 | $616.20 |
| 10.21.2018 | J. Zhang | Review articles concerning denial of MAT in prisons; research legal standards for ADA claims [redacted for privilege] | 1.2 | $568.80 |
| 10.22.2018 | J. Zhang | Research ADA standards [redacted for privilege]; draft reply section concerning ADA violation | 6.2 | $2,938.80 |
| 9.12.2018 | A. Valenti | Search for experts; draft expert declarations | 1.1 | $541.20 |
| 9.13.2018 | A. Valenti | Confer with Dr. Rosenthal regarding expert declaration; draft same | .5 | $246.00 |
| 9.14.2018 | A. Valenti | Attend team teleconference; attend to emails regarding briefing and declarations | .6 | $295.20 |
| 9.15.2018 | A. Valenti | Draft expert declaration of Dr. Rosenthal; review and revise other fact and expert declarations | 1.6 | $787.20 |
| 9.16.2018 | A. Valenti | Revise TRO/PI brief and declarations in support of same; correspond with Dr. Rosenthal regarding declaration | 2.0 | $984.00 |
| 9.17.2018 | A. Valenti | Attend team conference; contact potential experts | .9 | $442.80 |
| 9.18.2018 | A. Valenti | Attend team teleconference; finalize expert declarations; research potential HIPAA issues | 2.9 | $1,426.80 |
| 9.19.2018 | A. Valenti | Finalize declarations; revise TRO/PI brief; contact potential experts; | 2.8 | $1,377.60 |

| | | assist with preparation for filing of complaint and brief | | |
|---|---|---|---|---|
| 9.20.2018 | A. Valenti | Prepare and file emergency motions regarding briefing schedule; manage correspondence regarding same | 6.4 | $3,148.80 |
| 9.24.2018 | A. Valenti | Draft motion for hearing; [redacted for privilege] | 2.9 | $1,426.80 |
| 9.26.2018 | A. Valenti | Draft joint statement regarding briefing and hearing schedule; manage filing of same | .6 | $295.20 |
| 10.19.2018 | A. Valenti | Confer with ACLU team regarding expert declarations; revise same; prepare expert engagement letter | 1.6 | $787.20 |
| 10.20.2018 | A. Valenti | Attend team teleconference regarding reply brief; manage preparation for same | 1.2 | $590.40 |
| 10.23.2018 | A. Valenti | Draft reply brief in support of preliminary injunction; manage preparation of expert declarations in support of same | 3.2 | $1,574.40 |
| 10.24.2018 | A. Valenti | Draft reply brief in support of preliminary injunction; manage preparation of expert declarations in support of same | .5 | $246.00 |
| 10.31.2018 | A. Valenti | Prepare for oral argument; confer with ACLU counsel and Mr. Frederickson regarding same | 2.9 | $1,426.80 |
| 11.01.2018 | A. Valenti | Prepare for oral argument; attend and participate in moots | 7.0 | $3,444.00 |
| 11.05.2018 | A. Valenti | Prepare for oral argument; attend same | 7.2 | $3,542.40 |
| 11.27.2018 | A. Valenti | Attend team teleconference regarding decision on preliminary injunction; correspond with opposing counsel regarding same | 1.1 | $541.20 |

ACLU – Attorneys

| DATE | TIMEKEEPER | TASK | TIME | AMOUNT |
|---|---|---|---|---|
| 09.17.2018 | M. Segal | Review and edit draft pleadings; circulate to Goodwin | 1:33:00 | $968.75 (Approximated) |
| 09.18.2018 | M. Segal | Edit pleadings; correspondence with client re same | 0:30:00 | $312.50 |
| 09.19.2018 | M. Segal | Work on filings; email with client; email with A. Sixt; confer with J. Rossman, D. McFadden, and Goodwin team | 5:30:00 | $3,437.50 |
| 09.24.2018 | M. Segal | Work on reply brief; work on | 3:30:00 | $2,187.50 |

| | | amicus support | | |
|---|---|---|---|---|
| 10.25.2018 | M. Segal | Revise reply brief; review Goodwin edits re same; email with J Rossman re same | 5:30:00 | $3,437.50 |

| | | | | |
|---|---|---|---|---|
| 09.10.2018 | D. McFadden | Research and draft complaint; telephone counsel with co-counsel | 4:00:00 | $2,100.00 |
| 09.11.2018 | D. McFadden | Research and draft complaint; telephone call with probation counsel | 3:30:00 | $1,837.50 |
| 09.12.2018 | D. McFadden | Review and revise demand letter; coordinate medical records collection; client interview | 4:00:00 | $2,100.00 |
| 09.17.2018 | D. McFadden | Legal research regarding correctional regulations; document review of medical records; review and revise draft declarations; case planning; file management | 3:00:00 | $1,575.00 |
| 09.18.2018 | D. McFadden | Draft and revise complaint and TRO memo; legal research | 4:00:00 | $2,100.00 |
| 09.20.2018 | D. McFadden | Draft and revise motion to expedite; research and draft documents in response to court order | 4:00:00 | $2,100.00 |
| 09.21.2018 | D. McFadden | Draft and file notice of denial of continuance; coordination with state court counsel; internal coordination teleconferences; teleconference with opposing counsel | 3:00:00 | $1,575.00 |
| 10.16.2018 | D. McFadden | Interview potential expert; scheduling matters | 0:45:00 | $393.75 |
| 10.20.2018 | D. McFadden | Review opposition to PI; ACLUM teleconference regarding response strategy; Goodwin and ACLU teleconference regarding response strategy | 2:00:00 | $1,050.00 |
| 10.22.2018 | D. McFadden | Research and draft reply to opposition to PI; teleconference with potential witness | 4:30:00 | $2,362.50 |

### iv.    __Excessive Billing__

"In calculating the number of hours for which an attorney is entitled to compensation, a court first examines the number of hours actually expended, and then 'subtract(s) from that figure hours which were duplicative, unproductive, excessive, or otherwise unnecessary.'" *Martino v. MBTA,* 230 F. Supp. 2d at 201 (*quoting Grendel's Den, Inc. v. Larkin,* 749 F.2d 945, 950 (1st Cir. 1984)).

Plaintiff's counsel have billed excessively on numerous occasions.  The chart below over a half-dozen entries which, in addition to representing vague billing entries (see *infra*, p. 8) constitute excessive billing:

**EXCESSIVE BILLING ENTRIES**

ACLU – Attorney

| DATE | TIMEKEEPER | TASK | TIME | AMOUNT |
|--------|-------------|-------|------|--------|
| 10.31.2018 | J. Rossman | Oral argument preparation | 1:16:39 | $665.18 (Approximated) |
| 10.31.2018 | J. Rossman | Call with Goodwin team about argument | 0:27:08 | $236.25 (Approximated) |
| 10.31.2018 | J. Rossman | Oral argument preparation | 0:18:23 | $157.20 (Approximated) |
| 10.31.2018 | J. Rossman | Oral argument preparation | 1:07:18 | $586.43 (Approximated) |
| 10.31.2018 | J. Rossman | Oral argument preparation | 2:00:00 | $1,050 |
| 11.01.2018 | J. Rossman | Oral argument preparation | 3:12:03 | $1,680 (Approximated) |
| 11.01.2018 | J. Rossman | Oral argument preparation | 1:52:36 | $980.18 (Approximated) |
| 11.02.2018 | J. Rossman | Oral argument preparation | 1:19:47 | $691.43 (Approximated) |
| 11.02.2018 | J. Rossman | Oral argument preparation | 0:18:07 | $157.20 (Approximated) |
| 11.02.2018 | J. Rossman | Conversation with Alex V. regarding oral argument | 0:27:25 | $236.25 (Approximated) |
| 11.03.2018 | J. Rossman | Oral argument preparation | 4:43:31 | $2,476.43 (Approximated) |
| 11.03.2018 | J. Rossman | Oral argument preparation | 1:54:00 | $997.50 (Approximated) |

| 11.04.2018 | J. Rossman | Oral argument preparation | 3:42:01 | $1,942.50 (Approximated) |
| 11.04.2018 | J. Rossman | Oral argument preparation | 4:17:02 | $2,248.58 (Approximated) |
| 11.04.2018 | J. Rossman | Oral argument preparation | 2:45:51 | $1,443.75 (Approximated) |
| 11.05.2018 | J. Rossman | Oral argument preparation | 7:01:00 | $3,675 (Approximated) |
| 11.05.2018 | J. Rossman | Oral argument | 1:00:00 | $525.00 |

## III.    CONCLUSION

In light of duplicative, vague, block and excessive billing, and due to the fact that much of Plaintiff's Complaint—including affidavits and exhibits—relied heavily upon both the *Smith I and Smith II* cases, as well as the fact that this matter did not involve discovery, an evidentiary hearing nor a trial, Defendants seek a downward adjustment of the lodestar or in the alternative a fifty per cent (50%) across-the-board reduction in attorney's fees.

Respectfully submitted,

DEFENDANTS,
By their attorney,

    /s/ Stephen C. Pfaff
Stephen C. Pfaff (BBO# 553057)
Louison, Costello, Condon & Pfaff, LLP
101 Summer Street, 4th Floor
Boston, MA 02110
(617) 439-0305
blouison@lccplaw.com

Date: September 20, 2019

## CERTIFICATE OF SERVICE

I certify that on this day I caused a true copy of the above document to be served upon the attorney of record for all parties via CM/ECF

Robert Frederickson III (BBO 670111)
Michael Pickett (BBO 698618)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, Massachusetts 02210
Tel.: 617.570.1000
Fax.: 617.523.1231
RFrederickson@goodwinlaw.com
MPickett@goodwinlaw.com

Joel K. Goloskie (BBO# 675806)
PANNONE LOPES DEVEREAUX &O'GARA LLC
One International Place, Suite 1400
Boston, MA 02110
Ph: 617.535.7724
Fax: 866.353.5020
jgoloskie@pldolaw.com


_/s/Stephen C. Pfaff_____

Date: September 20, 2019            Stephen C. Pfaff